Melinda C. FRANK, Plaintiff,

v.

Howard R. RELIN, Defendant.

No. Civ. 86–371L.

United States District Court,
W.D. New York.

Aug. 1, 1989.

David Rothenberg, Rochester, N.Y., for plaintiff.

Teresa D. Johnson, Rochester, N.Y., for defendant.

## BACKGROUND

LARIMER, District Judge.

This is a civil rights action pursuant to 42 U.S.C. § 1983 by Melinda C. Frank (Frank) a former employee with the Monroe County District Attorney's Office against Howard R. Relin (Relin), Monroe County District Attorney for wrongful termination of plaintiff's employment.

Frank was employed by the Monroe County District Attorney's Office as a Victim–Witness Coordinator from December 1981 to November 16, 1985 when she was fired by District Attorney Relin. Plaintiff claims that she was fired in violation of her constitutional rights, that is, that she was fired for exercising her First Amendment right of free speech. It is not disputed that Frank was fired because of private conversations she had with Assistant District Attorney Louis Pilato concerning cases handled by other assistant district attorneys. Plaintiff claims that her speech with Pilato was "protectable" speech under the First Amendment and that her interest in exercising her constitutional rights outweighed any interest that the District Attorney had in the administration of his office.

Defendant moved for summary judgment dismissing the complaint. In a bench decision rendered May 10, 1988, I granted defendant's motion for dismissal of plaintiff's second cause of action. As to plaintiff's first cause of action, that her dismissal was in violation of her First Amendment right of free speech, I ordered a hearing to determine under principles set out in *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983) whether the speech in question was "protectable" speech. The court held three days of hearings in which Frank, Relin, Pilato and George R. Sofia, an Assistant District Attorney in charge of administration, testified.

For the reasons discussed below, defendant's motion for summary judgment dismissing plaintiff's first cause of action is denied.

## FACTS

As Victim–Witness Coordinator, Frank's primary responsibility was to work with witnesses in preparation for trial in connection with criminal cases handled by the several assistant district attorneys in the office. Frank was the only person performing that function when she started in 1981. When she was fired there were five people in the office and approximately twenty volunteers. In her role she would help the attorneys contact witnesses and would help the witnesses deal with the vagaries of the criminal justice system. She often would participate in attorney-witness interviews in preparation for trial.

Frank testified about two incidents concerning two prosecutors that prompted her conversations with Pilato.

In September 1985, Frank had a conversation with an unnamed police officer who asked her what Sam Tibone, a victim, was doing in the DA's office. The officer advised her that Tibone had an extensive criminal record. Frank related that information to the ADA handling the case. She testified that the ADA replied "don't tell me about it now, wait until after the trial." Frank did not pursue the matter.

In another incident, Frank claims that she learned of information that would tend to exculpate or at least be useful to a defendant named Larson who had been charged with homicide. Frank testified that she learned that an acquaintance of the victim would testify that Larson had been to the victim's apartment *prior* to the murder and had attempted to get into the apartment. She testified that when she advised the ADA in charge of the case of that fact, he told Frank not to bring the witness in for an interview. Rather, he would have an investigator check out whether any police report was made concerning this alleged incident. Frank testified that the ADA said that this information might weaken the prosecution's case because it would explain why the defendant's fingerprints were in the victim's apartment.

The day after the conversation concerning the Larson case, Frank went to see ADA Pilato and told him what had happened. This was the first of three private conversations that she had with Pilato. District Attorney Relin testified that it was the fact that she went to see Pilato on these three occasions that caused him to fire her.

Pilato was a senior, experienced ADA. He had been in the office for eleven years and he testified at the hearing that his title in August 1985 was Special Assistant District Attorney in Charge of the Investigative Unit. He estimated that he supervised 20–30 people in the DA's office although he had no supervisory responsibility over the Victim–Witness Bureau.

In her private conversation with Pilato she relayed to him all of the circumstances of her conversations and she told him that she was very concerned because she believed that important information was being ignored or not pursued by the two prosecutors in important criminal prosecutions. She told Pilato that she was not sure what information, especially information favorable to the defense, should be given to the prosecutors. At the hearing, Pilato confirmed the nature of these conversations with Frank. Frank was concerned because the prosecutor seemed to be telling her to forget or ignore evidence that could help the accused and hurt the prosecution's case.

Pilato told Frank to check back with the ADA on the Larson case to make sure that she understood his instructions. He also told her that he, Pilato, could not simply ignore her complaint because it seemed to implicate a *Brady* violation.[1] Pilato confirmed that Frank did not ask him to do anything about the matter.

Pilato testified that because of his experience it was common for staff and other prosecutors to come to him for advice and consultation on a wide range of matters. He had worked with Frank on other cases and he had previously discussed with her matters concerning the DA's office and the proper way to handle cases.

About a week later, Frank had a conversation with Pilato and advised him that there were no new developments. A short time later, however, in late August or early September 1985, Frank received additional information which concerned her very much and occasioned her third conversation with Pilato. This incident concerned the same murder defendant Larson.

The ADA in charge had asked Frank to contact a certain witness in the case. The witness informed Frank that on the day of the homicide, he had seen the defendant and the defendant said that he was "on Black Velvet and acid." Frank alleges that when she related this information to the

---

**1.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) stands, of course, for the general proposition that a prosecutor is required to turn over exculpatory information relating to guilt or innocence to the defense.

ADA, he told her not to bring the witness in because her statement would only help the defense's case. Frank testified that she was concerned because she felt that his response was "peculiar" in light of his normal practice to obtain all available information in a case.

Frank again spoke to Pilato about the matter. She claimed that on that particular day neither Relin nor the Chief Trial Assistant, Mary Ann Hawco, were available. She stated that she went to Pilato because, in her view, pertinent information concerning a homicide was not being properly investigated. Pilato confirmed Frank's recount of the meeting.

Without Frank's request or knowledge, however, Pilato immediately went to Supreme Court Justice Robert Kennedy, Supervisory Judge of the criminal courts in Monroe County, to report the substance of his conversations with Frank concerning the alleged misconduct.

When Frank learned of Pilato's actions, she was upset with him because he had promised to consult with her before taking any action. Apparently, Frank called the ADA in question about Pilato's report to Justice Kennedy. Kennedy also apparently contacted Relin and eventually both Frank and Pilato were fired for their actions.

Relin testified that it was his "policy" that employees should discuss "problems" only with their supervisors or with him. When he first met with Frank, he told her that her failure to discuss her concerns with him or another "supervisor" was a serious error in judgment.

Relin claimed that he was not concerned with the content of Frank's communications to Pilato, but he was concerned with the fact that she had chosen Pilato instead of her supervisors, apparently either Mary Ann Hawco, the Chief Trial Assistant or Sofia.

Sofia testified that when Frank first started she was under his "control" but as the job developed, she was controlled more by Hawco. Sofia, however, testified that he knew of no formal office policy or procedure for airing the types of concerns and complaints voiced by Frank to Pilato.

It is clear that the only reason for Frank's dismissal was her conversations with Pilato. Both Sofia and Relin conceded this. Relin testified that his primary concern and the reason for Frank's dismissal was her failure to vent her concerns with the proper people and the fact that she discussed one prosecutor's actions with another prosecutor. He viewed Frank's actions as "reprehensible" although not as bad as Pilato's which he viewed as the worst conduct he had seen in his seventeen years in the DA's office.

Aside from this episode, Frank appears to have been an exemplary employee, and she received favorable ratings for 1982–1984. In fact, both Sofia and Relin wrote her favorable letters of recommendation after her firing. Sofia's letter recommended Frank "without reservation." Relin's letter described her as "a real asset to the Monroe County District Attorney's Office," and he gave her the "highest recommendation" for future employment.

During his conversations with Frank immediately prior to her discharge, Relin admitted that Frank told him of her concerns concerning the apparent failure of the prosecutors to develop and pursue seemingly exculpatory information. In his discussions with Frank, Relin admitted that she used the term *"Brady"* although he believed that she did not have a clear understanding of the *Brady* doctrine but had merely picked up the phrase from Pilato.

### Discussion

Frank claims that she was fired in retaliation for exercising her right of free speech in connection with a matter of public concern, that is, the improper investigation of serious criminal cases by the D.A.'s office. District Attorney Relin claims that he fired Frank for insubordination and that decision was his prerogative especially concerning an employee like Frank who served at the pleasure of the D.A. Analysis of this issue must begin with certain basic well-established principles.

█ A public employee does not relinquish First Amendment rights to comment

on matters of public interest by virtue of government employment. *Connick, supra*, 461 U.S. at 140, 103 S.Ct. at 1686. A state "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Id.* 461 U.S. at 142, 103 S.Ct. at 1687. Furthermore, a state employee enjoys First Amendment protection even if he does not publicly express his views, but privately communicates them to his employer. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41, 46 (2d Cir.1983).

■ The question of whether expression by a state employee is constitutionally protected involves striking a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687, *quoting Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–1735, 20 L.Ed.2d 811 (1968); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977).

■ The threshold inquiry in applying the balancing test is whether Frank's expression constituted speech on a matter of public concern. *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *Connick*, 461 U.S. at 140, 103 S.Ct. at 1686. In other words, was the speech "protectable" speech. The question of whether expression addresses a matter of public concern must be determined by the "content, form and context of a given statement," as revealed by the entire record. *Connick*, 461 U.S. at 147–148, 103 S.Ct. at 1690.

"When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."

*Connick*, 461 U.S. at 146, 103 S.Ct. at 1690. Generally, when a public employee speaks only of matters of a personal interest rather than as a citizen upon matters of public concern, the propriety of the State's action should not be reviewed in a federal court. *Id.*

■ The determination of whether a public employee's speech is constitutionally protected is one of law, not fact. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7.

■ Defendant argues that plaintiff does not have a valid First Amendment cause of action because her "speech" was not about a matter of public concern, but her personal performance in the DA's office. Defendant contends that plaintiff was disappointed that the attorneys she approached did not embrace her suggested strategies for case management.

I have considered the content, form and context of Frank's statements and it is clear that they relate to a matter of public concern. Frank's statements to Pilato, a senior, experienced assistant DA who served in a supervisory capacity, related to the efficient and effective functioning of the office and to assuring that relevant, material evidence is fully developed and made available to the prosecution and the defense to guarantee that defendants obtain a fair trial. Clearly, these issues are matters of legitimate public concern. Undoubtedly, information that a prosecution witness has an extensive criminal record, that a defendant may have had access to a victim's home prior to a homicide and that the defendant may have been mentally impaired due to drugs is material and significant to both the prosecution and the defense. Such information, which might exculpate the defendant or aid in his defense in some way, is especially important to the defense. It is clear that the D.A.'s handling of this type of information is, and should be, a matter of deep public concern.

This was not just a personal employment dispute. Although Frank was initially concerned about her role in the DA's office, the evidence adduced at the hearing establishes that she did not merely complain out

of dissatisfaction that assistant DA's had ignored her input. Rather, she was concerned that in disregarding relevant information the prosecutors may not have been fully prepared for trial because they had not dealt with information that might be adduced at trial, notwithstanding their desire to ignore such information. A significant part of her concern was caused by the nature of the information that the prosecutors were allegedly discouraging her from collecting. This related to evidence that even a lay person would understand could be exculpatory or helpful to the defense. Certainly, after her initial conversation with Pilato during which she had been generally advised of the nature of the *Brady* doctrine, Frank sought to inform a senior member of the office that she was concerned that certain assistant DA's may not have been discharging their duties in investigating and prosecuting criminal cases.

The public interest in seeing that criminal cases are properly investigated and prosecuted and in guaranteeing that all defendants receive a fair and speedy trial is beyond dispute. If prosecutors told Frank to disregard evidence that would weaken the prosecution's case, and implicitly aid the defense, this would have violated their legal and ethical obligations. Such conduct would constitute a breach of public trust in the DA's office and would seriously undermine the fair administration of the criminal justice system.[2]

Although Frank was concerned about her role and responsibilities, I find that she was primarily concerned about what she perceived to be prosecutors' seeming indifference to evidence which may have been favorable to the defense. The issue of whether assistant DA's may have been suppressing relevant evidence that might be favorable to the defense is a matter of interest to the community upon which it is essential that employees of the DA's office be able to speak about freely without fear of retaliatory dismissal. Certainly a mem-

ber of the public could comment on these lapses; a member of the D.A.'s office should have the same right of comment.

Therefore, I conclude that Frank's "speech" relating to her concerns about whether the DA's office was discharging its duties in investigating and prosecuting criminal cases was a matter of public concern.

■ Because Frank's speech addressed a matter of public concern, the court must now balance her interests in making her statements against the State's interest in effectively and efficiently carrying out its public duties. The Supreme Court has stated that:

> To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Connick*, 461 U.S. at 151, 103 S.Ct. at 1692. Pertinent considerations in striking the balance are "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 107 S.Ct. at 2899.

"[T]he State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692. In the instant case, Frank's speech involved a matter of great importance to the public. Therefore, defendant must make a strong

---

**2.** In deciding whether Frank's speech was a matter of public concern, the court must examine the content of her speech. I conclude that her speech is protectable. This is not, however, the forum to determine whether or not the prosecutors said what Frank claimed that they said. My determination here that Frank's speech is constitutionally protected does not necessarily mean that Frank's charges have been proven.

showing that her conduct hindered the efficient operation of the DA's office.

There has been no demonstration that Frank's voicing of her concerns that certain assistant DA's may have been disregarding relevant evidence seriously impaired her working relationship with other staff and attorneys in the office or impeded her ability to perform her job. Further, there is no evidence that Frank was a "disruptive or otherwise unsatisfactory" employee. In fact, in a letter of reference, defendant Relin described Frank's contributions to the office as follows:

> She has made trying felony cases a pleasure for many of the attorneys within the Monroe County District Attorney's Office. On a personal level, I have found Ms. Frank to be a person who seeks out assistance and advice and a person who has an overriding concern for her office, and for the reputation of that office. Ms. Frank has been a real asset to the Monroe County District Attorney's Office....

Plaintiff's Exhibit 5. In his testimony, Relin did not cite any concern that Frank's conduct would hinder the efficient operation of the DA's office. Rather, he testified that the *only* reason for Frank's discharge was that she spoke to Pilato rather than her immediate supervisor or someone else in the chain of command.

The testimony reveals that although Pilato had no supervisory responsibility for the Victim–Witness Bureau, he was a senior, experienced attorney who had supervisory responsibility for 20–30 people in the Investigative Unit. In light of Pilato's seniority and experience, it was common for staff and other attorneys to consult with him and seek his advice on matters. There is no evidence that Frank violated an established office policy or procedure in consulting with Pilato. Rather, Relin's reaction to Frank's discussions with Pilato appear to be nothing more than an ad hoc response after learning that persons outside the office had been informed of Frank's statements.

It is also relevant that Frank's speech was not made in public, but in a private conversation with a supervisory employee in the office. There is no evidence that she "went public" in order to embarrass the office. There is no evidence that she knew of or acquiesced in Pilato's plans to divulge her statements to persons outside of the office.

"The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where ... an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful function from that employee's private speech is minimal." *Rankin,* 107 S.Ct. at 2900.

Defendant has not made a sufficient showing that Frank's conduct was an act of insubordination that would have a serious adverse impact on the ability of the DA's office to effectively and efficiently perform its responsibilities to the public. Given the important nature of Frank's expression, and the failure to demonstrate a state interest that outweighs her First Amendment rights, the balance must be struck for Frank. Therefore, her speech was constitutionally protected.

■ To prevail, plaintiff must also prove that her speech was a "substantial" or "motivating" factor in her dismissal. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir.1983). If she satisfies that burden, defendant then has the burden of showing that he would have reached the same decision concerning plaintiff's discharge even in the absence of the protected conduct. *Doyle,* 429 U.S. at 287, 97 S.Ct. at 576.

Defendant contends that Frank's discharge was based upon her poor judgment in consulting with Pilato rather than her immediate supervisor or himself and was not in reprisal for the *content* of her speech. Although there is evidence which suggests that Frank's dismissal can only be explained as retaliation, the hearing focused upon the issue of whether her speech

was constitutionally protected. In fairness, the parties should be allowed the opportunity to present additional evidence or argument on the issue of whether plaintiff's speech was a substantial factor in her dismissal. Thus, there may be questions of fact concerning whether the nature or content of Frank's speech was a substantial or motivating factor in her discharge and, ultimately, whether she was discharged in retaliation for exercise of her constitutionally protected right of freedom of expression.

## Conclusion

For the reasons stated above, defendant's motion for summary judgment on plaintiff's first cause of action is denied.

IT IS SO ORDERED.