Melinda C. FRANK, Plaintiff–Appellant,

v.

Howard R. RELIN, Individually and in his official capacity as the Monroe County District Attorney, Defendant–Appellee.

Nos. 1019, 1344, Dockets 92–9026, 93–7060.

United States Court of Appeals, Second Circuit.

Argued May 25, 1993.

Decided July 28, 1993.

1318

David Rothenberg, Rochester, NY (Geiger & Rothenberg, on the brief), for appellant.

William G. Gandy, Buffalo, NY (Thomas S. Gill, Lawrence J. Fineberg, Saperston & Day, P.C., on the brief), for appellee.

Before: NEWMAN, Chief Judge *, FEINBERG and KEARSE, Circuit Judges.

\* Judge Newman became Chief Judge on July 1,

1 F.3d--30

KEARSE, Circuit Judge:

Plaintiff Melinda C. Frank appeals from a final judgment of the United States District Court for the Western District of New York, David G. Larimer, *Judge*, dismissing her complaint seeking damages and other relief pursuant to 42 U.S.C. § 1983 (1988) against defendant Howard R. Relin for termination of her employment in violation of her rights under the First Amendment, and from an order of that court denying her motion to vacate the judgment pursuant to Fed. R.Civ.P. 60(b). Ruling that Frank had withdrawn her claim asserted against Relin in his official capacity, the district court dismissed the remainder of her complaint on the ground that Relin had qualified immunity with respect to the claim brought against him in his individual capacity. On appeal, Frank contends chiefly that the court erred (1) in ruling that she had withdrawn her claim against Relin in his official capacity, (2) in dismissing her complaint to the extent that it requested equitable relief, and (3) in granting summary judgment on Relin's defense of qualified immunity. For the reasons below, we agree, and we vacate and remand for further proceedings.

## I. BACKGROUND

From December 1981 until November 15, 1985, Frank was employed in the Office of the District Attorney ("DA") for Monroe County, New York (the "County"), as a "victim-witness coordinator." During the relevant period, Relin was the district attorney. His staff included a "First" assistant district attorney ("ADA"), whom we refer to as "A" and who was next in command after Relin; and Special ADA Louis P. Pilato, who ranked as a "Third" ADA and was in charge of the office's investigative unit. Pilato, who had served in the DA's office for some 11 years, was responsible for supervising several bureaus and 20–30 people who staffed those bureaus; he had no supervisory responsibility for the victim-witness bureau. Frank's direct supervisor was the office administrator, ADA George Sofia. Affidavits and testimony received in the district court, construed

1993.

in the light most favorable to Frank, reveal the following events preceding Relin's termination of Frank's employment.

### A. *Frank's Responsibilities and Her Concerns*

As victim-witness coordinator, Frank was a liaison between the DA's office and the victims of and witnesses to crimes. Her responsibilities included locating and contacting victims and witnesses, counseling them, participating in their interviews, and generally shepherding them through the trial process. Until the events in question, Frank ·by all accounts performed her job well. She consistently received "exceptional" ratings in annual reviews and was described as a "very hard working and dedicated" employee.

If, in the course of a conversation, a witness mentioned something to Frank that was not known to the ADA assigned to the case, Frank was to relay that information to the ADA. In early 1985, Frank was assisting one Sam Tibone, a victim and witness in a criminal case being handled by an ADA to whom we refer as "B". A police officer stopped Frank in the hallway outside the district attorney's office and asked her why she was with Tibone. When Frank explained that Tibone was the victim in a case, the officer advised her to tell ADA "B" immediately that Tibone " 'has ·a criminal record as long as your arm.' " (Hearing Transcript dated August 11, 1988 ("Aug. 11 Tr."), at 10 (testimony of Frank).) Frank promptly attempted to relay the information to "B". "B", however, stated that he did not want to hear about Tibone's criminal record until " 'after ·the trial is over.' " (*Id.* at 11.) Frank did not tell anyone about "B" 's reaction at that time.

In the summer of 1985, Frank was working on the prosecution of one David Larson, who was accused of murdering a fourteen-year old girl while she was babysitting. Apparently the police had found Larson's fingerprint at the crime scene, and "A", who was assigned to the case, viewed the fingerprint as a particularly strong piece of evidence. ·However, when, as requested by "A", Frank contacted two witnesses to determine whether they were still available for trial, the witnesses told Frank they had seen Larson at the crime scene prior to the date of the murder. The witnesses were willing to come to the DA's office to be interviewed; but according to Frank, "A" told her

> not to bother bringing them in for an interview, that he felt this would be very harmful to our case, that if we proved the defendant had been in the house prior to the night of the homicide, that this fingerprint would be thrown out.

(*Id.* at 15–16.)

The next morning, Frank approached Pilato and told him she was concerned about some information she had about a criminal case and was wondering what information the ADAs wanted·withheld before trial. Pilato asked Frank what she meant, and she told him about her conversations with "B" concerning the Tibone matter and with "A" concerning the Larson matter. Pilato told Frank: " 'I think that's Brady [*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] material.' " (Aug. 11 Tr. at 19 (testimony of Frank).) He explained to Frank, who did not know what *Brady* material was, that that meant the information should be turned over to the defense. Pilato was clearly concerned, saying,

> I'm going to have to do something about this. I don't know what it's going to be, but ... if this should *ever* come out, ... I could be disbarred.

(*Id.* at 20.) Frank asked Pilato to let her know what he intended to do before he took any action.

Some time later, "A" asked Frank to contact another potential witness in the Larson case. Frank spoke to the witness by telephone and learned that the witness knew Larson and had seen him at about 9:30 on the night of the murder. According to Frank, the witness

> said—her conversation with Larson was, "David, what are you on?" And his response to her was, "I'm on Black Velvet and acid."

(*Id.* at 22.)

Frank told "A" about her telephone conversation with this witness and asked him if

he wanted her to bring the witness in for an interview. "A" told Frank, " 'No, don't bring her in. That will only help the defendant's case.' " (*Id.* at 23.) Frank was concerned by this because normally "A" "followed up on every bit of information in order to avoid any surprises in the courtroom." (*Id.*) She therefore wanted to discuss the matter with someone. However, "A" had rushed off to attend to other matters; Relin was out of the office, as was the ADA who ranked just behind "A"; and Sofia, Frank's supervisor, had an office full of people. Frank therefore turned again to Pilato.

Frank told Pilato that "A" had told her not to bring in a potential witness who had indicated a defendant had been drinking and was on drugs. Frank asked whether Pilato would normally interview such a witness in his own cases; he stated he would and that he was " 'going to have to do something about this.' " (*Id.* at 25.) Frank asked him what he intended to do, to which he responded he did not know. Frank again asked Pilato to let her know what he intended to do before he did anything.

Immediately after that conversation, Pilato spoke to Justice Robert Kennedy, the supervisory judge of the Monroe County criminal courts, and reported on Frank's statements about "A" 's handling of the Larson case. Later that day, Pilato told Frank he had discussed the matter with Justice Kennedy, and Frank became upset because Pilato had acted without first telling her. That evening, Frank called "A" and told him what Pilato had done.

## B. *The Termination of Frank's Employment*

On September 13, 1985, Justice Kennedy summoned Relin and informed him that "A" might be mishandling potentially exculpatory material in the Larson case. Relin, apparently surprised by what he heard, returned to his office to investigate the matter. He learned that it was Pilato who had informed Justice Kennedy about the Larson matter and that Pilato's impetus had been a conversation with Frank. Relin stated that he had confronted Frank and inquired why she had not followed proper office procedure (de-

scribed by Relin at the hearing as an unwritten procedure) and expressed her concerns to her immediate supervisor or Relin, rather than discussing "A" 's case with Pilato. He told Frank "she had made the most serious type of error in judgment" and that he planned to discuss her performance with the members of his senior staff. (Hearing Transcript dated February 13, 1989 ("Feb. 13 Tr."), at 30 (testimony of Relin).)

Relin thereafter convened a meeting attended by, *inter alios,* Relin, Sofia, "A", and "B" (Pilato apparently had been fired immediately) to discuss the matter, and their principal focus appears to have been whether or not Frank should be fired. According to the testimony of Sofia, "[i]t was arrived at through a consensus meeting of the administrative division heads of the District Attorney's Office and the District Attorney" (*id.* at 15) "that Mrs. Frank could no longer be trusted; that her position was a key one, and she would be working with trial attorneys, and it was determined that she couldn't—her position was too important, and she could no longer be trusted" (*id.* at 14).

On September 20, 1985, Relin relieved Frank of her duties and asked her to resign. Three days later, Frank was given letters of recommendation by "A", Sofia, and Relin. "A" stated that the victim-witness program as initiated and expanded by Melinda ("Lynn") Frank "now serves as a model for other district attorneys offices throughout the State. In this regard, Lynn's dedication to this office, her work, and her attitude have, in my opinion, been excellent." ("To Whom It May Concern" Letter from "A" dated September 23, 1985.) After stating that Frank had assisted him personally in numerous cases, including some 15 homicide trials, "A" concluded:

> I have every confidence in Lynn Frank's abilities, and feel that her skills would translate well into any area of endeavor. I would certainly recommend Lynn most highly in whatever field she chooses.

(*Id.*) Sofia's letter was similar:

> As her supervisor, I can say that her dedication and devotion to her duties, as well as to this office, remained at the high-

est levels. Her insights into various aspects of the job were astute and timely.

Lynn will be missed here, but, I am sure wherever she goes, she will be a valued asset. I recommend her for employment without reservation.

("To Whom It May Concern" Letter from Sofia dated September 23, 1985.) Relin wrote that in her four years' work with the DA's office, Frank had "demonstrated outstanding skills in dealing with people" and had "made trying felony cases a pleasure for many of the attorneys within the Monroe County District Attorney's Office." ("To Whom It May Concern" Letter from Relin dated February [*sic*] 23, 1985.) Relin continued:

On a personal level, I have found Ms. Frank to be a person who seeks out assistance and advice and a person who has an overriding concern for her office, and for the reputation of that office. Ms. Frank has been a real asset to the Monroe County District Attorney's Office, and we will miss her very much. She would be an extremely valuable employee for any occupation that I can think of that deals with people, and I would give her the highest recommendation for future employment.

(*Id.*)

## C. The Present Lawsuit

Frank commenced the present action in April 1986 against "Howard R. Relin, in his official capacity as the Monroe County District Attorney," naming no other defendants, and not purporting to assert any claims against Relin in his individual capacity. The complaint alleged principally that Relin (1) had violated Frank's right to due process by depriving her of a property interest created by a state grant to the victim-witness program, and (2) had violated her First Amendment right to speak on matters of public concern; and it sought compensatory and punitive damages and attorney's fees. A jury trial was demanded. Relin's answer generally denied the allegations of the complaint, challenged the court's subject matter jurisdiction, and asserted that Frank's resignation had been the result of her own culpable conduct and had been voluntary.

Following some two years of discovery, Relin moved for summary judgment principally on the grounds (1) that Frank had no property interest in her position, and (2) that her speech was not protected by the First Amendment. As to the latter ground, Relin contended chiefly that Frank had been concerned not with a matter of public importance but with her own performance in the DA's office, and that she had complained to Pilato because she was disappointed that the ADAs with whom she worked did not embrace her suggested strategies for case management. He also contended that he had discharged Frank not because of the content of her statements to Pilato but because of her poor judgment in consulting with Pilato rather than her immediate supervisor or Relin.

The district court granted the motion to dismiss the due process claim on the ground that Frank lacked a property interest in her job, and it ordered an evidentiary hearing designed to permit it to decide the issues of law relating to the First Amendment claim. Following that hearing, at which Frank, Relin, Sofia, and Pilato testified as to the events preceding Frank's termination, the court, in a decision and order dated August 1, 1989 ("1989 Decision"), reported at 719 F.Supp. 138, denied Relin's motion for summary judgment on the First Amendment claim. Without deciding whether or not ADAs "A" and "B" had made the statements Frank attributed to them, *id.* at 143 n. 2, the court found that "[t]his was not just a personal employment dispute," *id.* at 142, and that Frank "was primarily concerned about what she perceived to be prosecutors' seeming indifference to evidence which may have been favorable to the defense," *id.* at 143. It concluded that

Frank's statements to Pilato, a senior, experienced assistant DA who served in a supervisory capacity, related to the efficient and effective functioning of the office and to assuring that relevant, material evidence is fully developed and made available to the prosecution and the defense to guarantee that defendants obtain a fair

trial. Clearly, these issues are matters of legitimate public concern.

*Id.* at 142.

Stating that Relin had not cited any concern that Frank's conduct would hinder the efficient operation of the DA's office but instead "testified that the *only* reason for Frank's discharge was that she spoke to Pilato rather than her immediate supervisor or someone else in the chain of command," *id.* at 144 (emphasis in original), and that there was "no evidence that Frank violated an established office policy or procedure in consulting with Pilato," *id.*, the court concluded that there remained questions of fact as to whether Frank had been fired because of the content of her speech:

> [T]here may be questions of fact concerning whether the nature or content of Frank's speech was a substantial or motivating factor in her discharge and, ultimately, whether she was discharged in retaliation for exercise of her constitutionally protected right of freedom of expression.

*Id.* at 145.

In November 1990, more than a year later, Relin sought to amend his answer in order to raise an affirmative defense of qualified immunity. Frank responded that if Relin were to amend his answer, Frank would wish to amend her complaint to add a claim against Relin in his individual capacity. The district court decided to allow Frank first to amend her complaint, following which Relin could file a new answer.

Frank filed her amended complaint in April 1991, asserting claims against Relin in both his official and his individual capacities. In addition to seeking the monetary relief requested in the original complaint, the amended complaint also requested equitable relief in the form of reinstatement, with backpay and full seniority rights. After moving unsuccessfully to dismiss the amended complaint's individual-capacity claim on statute-of-limitations grounds, on the theory that that claim did not relate back to the date of the initial complaint, Relin filed his amended answer, again generally denying the allegations of the complaint, and asserting, in addition to his original defenses, the defense of qualified immunity.

In April 1992, Relin moved for summary judgment (1) dismissing the claim asserted against him in his individual capacity on the ground of qualified immunity, and (2) dismissing the claim for monetary damages asserted against him in his official capacity, on the ground that there was no basis for imposition of municipal liability. In connection with the former, Relin submitted an affidavit stating that

> Frank had a duty to inform me or her supervisor of her concerns about how prosecutions were being handled.
>
> 14. It was Frank's *failure to tell me or her supervisor of her concerns,* and not her conversations with Pilato, which resulted in her discharge.

(Affidavit of Howard R. Relin dated April 7, 1992, ¶¶ 13, 14 (emphasis in original).)

In connection with the motion to dismiss the official-capacity claim, Relin asserted (a) that though he "ha[d] discretion to hire and fire his employees" (Memorandum of Law in Support of Defendant's Motion for Summary Judgment filed May 1, 1992, at 2), he was not a policymaker because Frank's job was a civil service position and the final policymakers were the County Civil Service Commission or Director of Personnel Services, and (b) that Frank had not established, as required by *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (*"Monell"*), that she had been fired pursuant to a municipal policy or custom. As discussed in greater detail in Part II.A. below, Frank responded that *Monell* was not relevant because she was not seeking monetary relief against the County but only against "Relin, in his individual and official capacities." (Plaintiff's Memorandum of Law in Opposition to Defendant's Final Motion for Summary Judgment dated May 7, 1992 ("Frank Summary Judgment Memorandum"), at 2.)

In an unreported Decision and Order dated August 24, 1992 ("1992 Decision"), the district court granted Relin's motions for summary judgment and dismissed the complaint in its entirety. The court dismissed Frank's official-capacity claim chiefly on the ground that, in responding to Relin's sum-

mary judgment motion, Frank had withdrawn that claim. The court also stated that if Frank had not withdrawn the claim, it would have been dismissed on the ground that she "ha[d] offered no evidence to support a claim that the alleged constitutional violation was a result of municipal policy or that defendant is a policymaking official." 1992 Decision at 9 n. 4.

As to the individual-capacity claim, the court ruled that Relin was entitled to qualified immunity. It stated that

the qualified immunity inquiry in this case is whether, in light of the clearly established law in 1985 and the circumstances that confronted Relin when he fired plaintiff, a reasonable district attorney could have believed that plaintiff's speech did not touch on a matter of public concern, or that under the *Pickering [v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) ] balancing-of-interests analysis, plaintiff's interests in speaking out, as a citizen, were outweighed by the interests of the District Attorney's Office, as an employer, in promoting the efficiency of its prosecutorial function.

When he fired her, Relin knew that plaintiff's speech involved allegations that touched on issues relating to possible *Brady* material.

1992 Decision at 13. But the court found it significant that plaintiff's speech raised, at most, only the specter of a possible *Brady* violation. Plaintiff made no allegations then, or now, to suggest that she believed that certain ADAs in the District Attorney's Office were involved in an attempt to deprive criminal defendants of access to *Brady* material or an attempted cover-up of past wrong-doings. Thus, at most, plaintiff's speech concerned a dispute over the proper interpretation of the *Brady* doctrine, a legal issue over which reasonable minds could differ. As such Relin was reasonable in believing that the speech was not entitled to much weight in the *Pickering* balancing-of-interests analysis. *See Giacalone [v. Abrams,* 850 F.2d 79, 86 (2d Cir.1988) ] (speech which expressed differences of opinion on legal strategy was

not entitled to much weight). It is also significant that plaintiff was not a lawyer, because even if I assume that plaintiff intended to allege that ADAs were failing to disclose *Brady* material, plaintiff's status as a nonlawyer made it reasonable for Relin to give plaintiff's opinion on a legal matter, and her First Amendment interests in expressing that opinion, little weight under the *Pickering* analysis.

In contrast, it was objectively reasonable for Relin to believe that the interests of the District Attorney's Office in promoting the efficiency of its prosecutorial services were high, and that plaintiff's speech and conduct had an adverse impact on these interests.

. . . . .

The need for confidentiality and personal loyalty, as a foundation for establishing good working relationships, is especially critical to the proper functioning of a district attorney's office. The nature of the work done in a prosecutor's office is such that prosecutors must be able to trust each other and their staff in order to operate effectively. Breaches of confidentiality, loyalty, or trust, whether real or imagined, pose a serious threat to the efficient operation of a district attorney's office, and can undermine the effectiveness of the prosecutorial services it provides.

1992 Decision at 15–17 (footnote omitted). The court found that Relin's staff members felt that Frank could no longer be trusted, and it concluded that

[i]n light of the concerns that were expressed to him, it was objectively reasonable for Relin to believe that interests of the District Attorney's Office were in jeopardy, and, therefore, that he could lawfully discharge plaintiff under the *Pickering* balancing-of-interests analysis. Even if the staff member's [*sic* ] concerns were misguided—or even mistaken—the fact that Relin was confronting a situation in which members of his staff expressed concerns over plaintiff's trustworthiness made his own beliefs regarding the interests of the District Attorney's Office reasonable.

1992 Decision at 17.

Judgment was entered dismissing the complaint, and Frank promptly appealed.

Thereafter, she moved in the district court pursuant to Fed.R.Civ.P. 60(b) to set aside the judgment on the ground that her amended complaint sought two forms of equitable relief and that qualified immunity was not a defense to a claim for such relief. The district court denied the motion, and Frank has appealed that decision as well.

## II. DISCUSSION

On appeal, Frank contends principally (1) that she did not withdraw her official-capacity claim against Relin, (2) that the district court could not properly dismiss her claim for reinstatement and backpay because that was an equitable claim to which qualified immunity is not a defense, and (3) that Relin was not entitled to summary judgment on his qualified-immunity defense even against her claim for damages. Though some of Frank's arguments confuse the principles and immunity defenses applicable to § 1983 actions, *see generally Gan v. City of New York*, 996 F.2d 522, 529–30 (2d Cir.1993), we conclude for several reasons that the district court erred in dismissing her official-capacity claim, and we conclude that the existence of fact issues made summary judgment inappropriate with respect to Relin's qualified-immunity defense against the individual-capacity claim.

### A. *The Official–Capacity Claim*

The district court ruled that Frank had withdrawn her claim against Relin in his official capacity, and it dismissed that claim chiefly on that basis, noting its view also that Frank had presented no evidence of a municipal policy leading to her firing. We conclude that the court should not have dismissed the official-capacity claim for three reasons: (1) the memorandum on which the court relied for its conclusion that Frank had withdrawn this claim displayed a doctrinal confusion that should not have been automatically equated with a withdrawal of the claim; (2) the court did not explore the role of a district attorney as policymaker in the administration of his office; and (3) the court summarily dismissed Frank's official-capacity claim in its entirety, notwithstanding the fact that Relin had sought summary dismissal of

that claim only to the extent that it requested money damages.

### 1. *Frank's Confusion*

■ The Frank memorandum on which the district court relied in concluding that she had withdrawn her official-capacity claim was submitted in response to Relin's motion to dismiss her monetary claims. Relin's motion contended—correctly, as we discuss below—that a suit against him for monetary relief in his official capacity constituted, in effect, a suit against the County and that the principles governing municipal liability applied. Frank's response to this argument was, in pertinent part, as follows:

> Defendant's motion for summary judgment must be denied because the motion misconstrues applicable law regarding the impact of defendant's decision-making authority. Defendant's motion relies on Supreme Court cases that limit a *municipality's* [emphasis in original] liability for the actions of a municipal official. In the instant case, however, *plaintiff has not sued any municipality, but has only sued the defendant Relin, in his individual and official capacities . . . .*
>
> . . . .
>
> [*Monell* and its progeny] would raise difficult issues in the context of the present case, had plaintiff elected to sue the County of Monroe. In that instance, the court would have been called upon to determine whether District Attorney Relin was a municipal policy maker, and whether the particular decision made by Relin with respect to terminating plaintiff's employment represented official County policy. But it is unnecessary to decide these difficult issues in the instant case because of this simple fact: *Plaintiff has not sued the municipality. She has not named the County of Monroe as a party defendant. Instead, plaintiff has sued only defendant Howard R. Relin, who is now named in his individual and official capacities.* Accordingly, the issues raised by *Monell* . . . are simply inapposite to the instant case.

Defendant's own argument in support of the instant motion for summary judgment seems to acknowledge the flaw in his rea-

soning. Defendant argues that he is required to comply with New York Civil Service Law and the rules and policies of the Monroe County Civil Service Commission. This contention is beside the point, because plaintiff's employment was not governed by New York Civil Service Law; at no time was her position a civil service position.... Furthermore, after making this argument, defendant states that "Monroe County cannot be held liable for Relin's actions in matters of employment and personnel administration including his decision to [terminate plaintiff]." ... Without conceding the validity of this argument, *plaintiff simply notes that she is not seeking to hold the County of Monroe liable for Relin's actions; rather, she is simply seeking to hold the defendant liable, in his official and individual capacities.*

(Frank Summary Judgment Memorandum at 2–4 (emphasis added, except where indicated).) The district court construed these statements as an "admission that she does not wish to sue Monroe County" and as a "withdrawal of her claim against defendant in his official capacity." 1992 Decision at 9.

Frank's belief that an official-capacity suit against an individual is not in effect a suit against the governmental entity of which he is an official was, of course, a misconception. "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official...." *Hafer v. Melo,* —— U.S. ——, ——, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991). Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Consequently, Frank's repeated statements that she was not suing the County and was not seeking to hold it liable for Relin's actions were fallacious in light of her repeated statements that she sought to recover from Relin in his official capacity.

 Such confusion is not uncommon, however, *see, e.g., Gan v. City of New York,* 996 F.2d at 529–30, and in order to avoid disadvantaging a party with a potentially viable claim solely on account of counsel's mis-

conceptions, courts afford plaintiffs more leeway than usual with respect to the characterizations of their § 1983 claims against government officials. For example, when the face of a complaint fails to state clearly whether a government official is being sued in his official capacity, or his individual capacity, or both, courts look to " '[t]he course of proceedings' " to determine "the nature of the liability to be imposed." *Kentucky v. Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14 (quoting *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 876, 83 L.Ed.2d 878 (1985)). Thus, a plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other. By the same token, a party who is unclear in argument as to the capacity in which the defendant can be pursued should not lightly be deemed to have withdrawn a claim that was expressly stated. When the party's defense of her stated claim bespeaks a doctrinal confusion, the court should not presume that there has been abandonment but should instead give her the opportunity either to abandon the claim or to pursue it with a corrected understanding as to what proof will be required to establish it.

In the present case, notwithstanding the doctrinal confusion displayed by Frank's memorandum, one fact stands out clearly: Frank, who had expressly asserted a claim against Relin in his official capacity, had no thought whatever that she was abandoning her claim against Relin in that capacity. While no doubt a party could, in defending against a motion for summary judgment, concede that a claim lacked merit, Frank's memorandum made no such concession. And whether Frank would actually have chosen to abandon her official-capacity claim if she had understood that the principles governing suits against a municipality were applicable to her official-capacity claim, *see Hafer v. Melo,* —— U.S. at —— – ——, 112 S.Ct. at 361–62 ("Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" must have played a part in the violation of federal law.' "); *see gener-*

*ally Gan v. City of New York,* 996 F.2d at 529 is not answered in this record.

On remand, Frank should be given the opportunity to elect whether to pursue the official-capacity claim.

### 2. *District Attorney as Municipal Policymaker*

■ Nor do we agree with the district court's alternative view that Frank's official-capacity claim was dismissable because she had "offered no evidence to support a claim that the alleged constitutional violation was a result of municipal policy or that defendant is a policy-making official." 1992 Decision at 9 n. 4. The district court's conclusion that there was no indication that Relin was a policymaking official within the meaning of *Monell* is, at best, premature. We have noted that generally, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Walker v. City of New York,* 974 F.2d 293, 301 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993); *see also Gan v. City of New York,* 996 F.2d at 536 (same).

Construed in her favor, the record indicates that Frank was hired by Relin's predecessor and was reappointed by Relin upon his election to district attorney. She was asked to resign by Relin after he had discussed the matter with "the top administrative personnel in the district attorney's office" (Feb. 13 Tr. at 5 (testimony of Sofia)). Plainly Relin undertook his actions as manager of the Monroe County District Attorney's Office.

Though Relin contended that he was not a policymaker because Frank's position was controlled by civil service laws and that his discretion to hire and fire was subject to review and regulation by the County Civil Service Commission, Frank denied that her position had ever been covered by civil service, and the district court declined to decide this issue. Nor has that issue, undeveloped below, been fully briefed on this appeal. We would note, however, that there is a good deal of tension between Relin's contention that Frank's position was governed by civil service and the proposition that he was permitted to fire her in the interest of improving office "efficiency" or morale.

In any event, the matter of whether Relin had final policymaking authority is a question of state law and is an issue to be decided by the court. *See, e.g., Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). If Relin was not the final decisionmaker, of course, the decisionmaker cannot be held liable for Relin's actions on a theory of *respondeat superior,* though it can be held liable if it approved of or acquiesced in his actions. *See generally id.* at 736–38, 109 S.Ct. at 2722–24.

### 3. *The Equitable Claim*

■ Finally, we note that Relin's motion for summary judgment with respect to the official capacity claim sought dismissal only "with respect to Plaintiff's request for monetary damages." (Motion for Summary Judgment dated April 30, 1992, at 1.) In her amended complaint, Frank requested not only monetary relief but also reinstatement, relief that was equitable. Relin made no effort to present grounds to support summary dismissal of Frank's claim to the extent that it sought reinstatement. The court apparently viewed the reinstatement claim, *sua sponte,* as one to which Relin's defense of qualified immunity was applicable. However, such equitable relief could be obtained against Relin only in his official, not his individual, capacity; and a defense of qualified immunity may properly be raised only with respect to claims asserted against a defendant in his individual capacity. Qualified immunity is not a defense to a claim against a municipal official in his official capacity. *See Hafer v. Melo,* —— U.S. at ———— ——, 112 S.Ct. at 361–62; *Kentucky v. Graham,* 473 U.S. at 167, 105 S.Ct. at 3105–06; *Gan v. City of New York,* 996 F.2d at 529.

Accordingly, the court's summary dismissal of the official-capacity claim to the extent that it sought equitable relief was error.

### B. *Qualified Immunity and the Individual–Capacity Claim*

■ In a § 1983 action, qualified immunity shields a defendant official sued in his indi-

vidual capacity "from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or, even where the rights were clearly established, if it was objectively reasonable for the official to believe that his acts did not violate those rights, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Robison v. Via*, 821 F.2d 913, 921 (2d. Cir.1987). In order to determine whether a particular right was clearly established at the time a defendant acted, a court should consider:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992); *see also Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993). Such immunity does not attach where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. at 3039; *see, e.g., Piesco v. City of New York*, 933 F.2d 1149, 1160 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); *Vasbinder v. Ambach*, 926 F.2d 1333, 1341 (2d Cir.1991).

 Absent extraordinary circumstances, if the law was clearly established, the defendant official is not entitled to summary judgment on his immunity defense "since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. at 819, 102 S.Ct. at 2738. Nonetheless, even where the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him

to believe that his acts did not violate those rights. *See, e.g., Malley v. Briggs*, 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098–99, 89 L.Ed.2d 271 (1986); *Robison v. Via*, 821 F.2d at 921. In such a case, the defense will turn on the particular facts, and summary judgment will be appropriate only if the defendant "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right. *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, J., sitting by designation); *Robison v. Via*, 821 F.2d at 921.

### 1. The Clearly Established First Amendment Principles

 With respect to the claim asserted by Frank, it was established prior to 1985 that government employees had a right under the First Amendment, though not an unlimited right, to speak on matters of public concern. *See, e.g., Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). Where a government employer discharges an employee on account of the employee's speech, the determination of whether the public employer has properly discharged the employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.; see also Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987).

 To make out a prima facie case on such a claim, the employee must establish first that her speech can be " 'fairly characterized as constituting speech on a matter of public concern,' " *id.* (quoting *Connick v. Myers*, 461 U.S. at 146, 103 S.Ct. at 1690), and second "that that speech was at least a 'substantial' or 'motivating' factor in the dis-

charge," *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993) (quoting *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The first element is a question of law, the second a question of fact.

If the plaintiff establishes both elements, the employer may nonetheless escape liability in either of two ways. It may prevail if it can show that it would have made the same decision in the absence of the protected conduct, *see Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 286, 97 S.Ct. at 575, or if it can show that the employee's conduct interfered with its "effective and efficient fulfillment of its responsibilities to the public," *Connick v. Myers*, 461 U.S. at 150, 103 S.Ct. at 1692. With respect to the latter defense, "the [government]'s burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Id.*

### 2. *The Record in the Present Case*

The record in the present case did not permit summary judgment in favor of Relin on his qualified immunity defense for two reasons. First, Frank's speech plainly centered on a matter of societal importance, *i.e.*, "assuring that relevant, material evidence [wa]s fully developed and made available to the prosecution and the defense to guarantee that defendants obtain[ed] a fair trial," 1989 Decision, 719 F.Supp. at 142. Second, there are questions of fact as to the reasons Relin fired Frank, and those questions affect both the merits and the qualified immunity defense.

As to the nature of Frank's speech, we reject the district court's 1992 view that that speech did not concern possible wrongdoing in the DA's office but "at most, . . . concerned a dispute over the proper interpretation of the *Brady* doctrine, a legal issue over which reasonable minds could differ," and that Relin could reasonably have believed that this was merely an "opinion on a legal matter" that was entitled to little weight in the *Pickering* balancing-of-interests analysis. 1992 Decision at 15–16. In reaching this conclusion, the district court

likened Frank's concerns to those of the attorney-plaintiff in *Giacalone v. Abrams*, 850 F.2d 79, 87–88 (2d Cir.1988). The two cases are not parallel.

In *Giacalone*, the plaintiff disagreed with his superiors as to the proper interpretation of certain provisions of the federal tax laws and hence as to the appropriate steps to be taken with respect to certain administrative matters. Giacalone sought to make his own views known to members of the public and to belabor them within the office. Prior to being fired, he made no accusations as to any serious matters of potential impropriety.

In the present case, there is no indication in the record that Frank, a nonlawyer, sought to contest the meaning of *Brady*. Indeed, when she first questioned Pilato as to what information the ADAs wanted or did not want to receive, Frank did not even know what the *Brady* doctrine was. She merely understood (1) that she had certain information that had logical relevance (an understanding not dependent on legal training); (2) that both "A" and "B" told her they did not want the information prior to trial; and (3) that "A" told her he did not want it because it would be helpful to the defendant. But whether or not Frank was aware of *Brady*, she, unlike the plaintiff in *Giacalone*, was plainly raising questions of serious public concern. *See, e.g., Connick v. Myers*, 461 U.S. at 148, 103 S.Ct. at 1691 (question of "actual or potential wrongdoing . . . on the part of" the district attorney's staff is a matter of serious public concern); *see also Dobosz v. Walsh*, 892 F.2d 1135, 1141–42 (2d Cir.1989) (same re police officer's cooperation with Federal Bureau of Investigation ("FBI") and testimony against fellow officer as to possible planting of gun on person shot by latter officer); *Vasbinder v. Ambach*, 926 F.2d at 1341 (same re plaintiff's report to FBI of his suspicions of overbilling in federally funded program overseen by his agency); *Rookard v. Health & Hospitals Corp.*, 710 F.2d 41, 46–47 (2d Cir.1983) (same re government employee's private report of allegations of corrupt and wasteful practices outside chain of command to agency's inspector general). In sum, as a matter of law, the district court erred in characterizing Frank's conver-

sations with Pilato as touching only insignificantly on a matter of public concern.

Nor could Relin reasonably have viewed Frank's statements as not touching on a matter of public concern. Even if Relin were, on his own, inclined to view the matter as not significant, as the district court did in its 1992 Decision, the very fact that a New York Supreme Court Justice summoned him to chambers to broach the matter would have made it clear to any objectively reasonable official that the substance of Frank's statements was a matter of serious public concern and hence could not be weighed lightly in the *Pickering* balancing-of-interests analysis.

■ Further, the issue of Relin's motivation in firing Frank was one that clearly involved disputed questions of fact. The record would permit a rational factfinder to infer that Frank was fired because of the content of her speech, *i.e.,* because she disclosed actual or potential wrongdoing by "A" and "B". The district court found instead that Relin fired Frank because the ADAs he consulted felt Frank could no longer be trusted and Relin believed her continued presence would therefore be detrimental to the office's interest of "efficiency," and that such a belief provided him with qualified immunity even if the ADAs' views were "misguided." This conclusion would be questionable even were there no issue of fact as to Relin's motivation. Prosecutorial "efficiency" cannot outweigh the right of an employee to raise with a supervising attorney the question of nondisclosure of *Brady* material, especially when the main champions of that countervailing "efficiency" are those implicated in the suggestion of *Brady* derelictions. If the reason for the ADAs' desire to be rid of Frank were a lack of trust in her ability or willingness to remain silent about *Brady* violations, office efficiency or morale grounded on such considerations could not outweigh Frank's speech, and a competent public official could not reasonably believe that it would.

In any event, the court's attribution of Frank's firing to a desire to maintain office efficiency constitutes a finding of fact as to Relin's motivation. On a motion for summary judgment, the district court's function is to identify questions of fact, not to decide them. Nor may the court make credibility assessments; those assessments are to be made by the finder of fact. As the district court seemed to recognize in its 1989 Decision, the question of Relin's motivation could not be decided as a matter of law. Indeed, we note that Relin's positions in this litigation have presented something of a moving target. His initial answer to the complaint took the position that Frank had not been fired but had resigned voluntarily. At the February 13, 1989 hearing, he suggested that Frank had been fired because her conversations with Pilato had impaired "the workings of the office and the functionings of the office." (Feb. 13 Tr. at 56.) In a 1992 affidavit, he stated that he had fired Frank because she had not brought her *Brady* concerns to him or Sofia, and not because she had spoken to Pilato. And one of Relin's 1992 memoranda in support of summary judgment went so far as to intimate that Frank had been fired because, by asking Pilato not to take any action with respect to the actions of "A" and "B" without first informing her, she had in fact sought to *conceal* the *Brady* derelictions. An assessment of the credibility of Relin's denial that he fired Frank because of the content of her disclosures to Pilato may well be affected by the variety of positions he has taken.

Relin's contention that Frank's conduct had impaired office relationships was supported by Sofia's testimony that the top ADAs felt Frank could not be trusted. That testimony itself, however, assuming it were credited in the face of the glowing posttermination letters of recommendation written for Frank by Sofia, Relin, and "A", raises questions as to the focus of the mistrust. A rational factfinder could conclude that a mistrust based on Frank's action in taking her *Brady* concerns to "a senior, experienced assistant DA who served in a supervisory capacity," 1989 Decision, 719 F.Supp. at 142, was no more than an antipathy for the content of Frank's statements, *i.e.,* that the ADAs felt that they could not trust Frank not to disclose *Brady* violations. And the credibility of Relin's suggestion that he fired Frank solely because she did not come to him with her *Brady* concerns, in order to

permit Relin to investigate them, is suspect in light of the fact that his administrative response was to consult, as to whether Frank should be fired, with the very ADAs who may have been committing the *Brady* infractions.

Finally, the court could not properly uphold Relin's qualified immunity defense as a matter of law on the premise that he was entitled to believe that Frank's First Amendment rights did not outweigh the countervailing interests, for the factual question as to Relin's motivation in firing Frank raises a factual question of precisely what interests Relin was weighing against Frank's First Amendment right. If Relin fired Frank because she "blew the whistle" on *Brady* violations, that consideration could not outweigh her First Amendment right to speak up about those violations, no matter how piercing the whistle to the ears of the ADAs.

## CONCLUSION

For the above reasons, we conclude that the district court erred in summarily dismissing Frank's claims against Relin in his official capacity and in his individual capacity. We have considered all of Relin's arguments in opposition and have found them to be without merit. The judgment and Rule 60(b) order of the district court are vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.