Susan SOTO and Gilbert
Acosta, Plaintiffs,

v.

Anthony SCHEMBRI, Commissioner New York City Department of Correction, Laura Rigby, Deputy Commissioner, Investigations and Management Services, Department of Correction, New York City Department of Correction and the City of New York, Defendants.

George MUENCH, David Ruiz, and
Frances Parks, Plaintiffs,

v.

Anthony SCHEMBRI, as Commissioner, New York City Department of Correction, Richard Pagan, as Director of Investigations, New York City Department of Correction, Eric M. Taylor, as Chief of Department, New York City Department of Correction, The City of New York, New York City Department of Corrections, Defendants.

Nos. 95 CIV. 421(DLC),
95 CIV. 547(DLC).

United States District Court,
S.D. New York.

March 28, 1997.

Pamela H. Schwager, Dienst & Serrins, L.L.P., New York City, for Plaintiffs.

Paul A. Crotty, Judith C. McCarthy, Corporation Counsel of City of New York, New York City, for Defendants.

COTE, District Judge:

Defendants move for summary judgment pursuant to Rule 56, Fed.R.Civ.P., for plaintiffs' claim under Section 1983, Title 42, Unit-

ed States Code, for a retaliatory employment decision in violation of their First Amendment rights. Defendants also move to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., plaintiffs' claim under Section 1985, Title 42, United States Code, for conspiracy to violate their First Amendment rights. Plaintiffs oppose the motion for summary judgment but offer no opposition to the motion to dismiss. For the reasons given below, defendants' motion for summary judgment on the Section 1983 claim is granted. Defendants' motion to dismiss the Section 1985 claim is also granted.

## BACKGROUND

Plaintiffs Susan Soto ("Soto"), Gilbert Acosta ("Acosta"), Frances Parks ("Parks"), David Ruiz ("Ruiz"), and George Muench ("Muench") are corrections officers for New York City's Department of Corrections ("DOC"). All five plaintiffs worked for the 1994 Pataki Election Campaign ("Pataki Campaign") from September 1994 until and including election day, November 8, 1994. Plaintiffs allege that defendants transferred the plaintiffs to different worksites because the plaintiffs worked for the Pataki Campaign. Plaintiffs filed this action against various New York City officials, DOC and the City itself. The individuals named are Anthony Schembri ("Schembri"), Commissioner of DOC, Laura Rigby ("Rigby"), a DOC Deputy Commissioner, Eric Taylor ("Taylor"), Chief of the Department of Corrections, and Richard Pagan ("Pagan"), the Director of Investigations at DOC.

The facts recited herein are undisputed unless otherwise noted. In November 1994, plaintiffs Soto and Parks were working in the administration office of the Anna M. Kross Correctional Center ("AMKC"), and plaintiffs Muench, Acosta and Ruiz were working in the personnel office at AMKC. The AMKC is a facility at Rikers Island, a New York City jail. After George Pataki was elected governor on November 8, 1994, the Investigation and Management Services Division of DOC initiated an investigation to determine the truth of an allegation that two DOC corrections officers had used their positions to organize up to six hundred corrections officers

to assist in the Pataki Campaign. Rigby, a Deputy Commissioner for DOC's Investigations and Management Services Division, supervised and led the investigation. In the course of her regular employment, Rigby reported directly to Schembri on virtually all matters. For this investigation, however, she reported to Robert Daly ("Daly"), the First Deputy Commission of DOC, because Schembri had recused himself from any involvement with the investigation. The investigation inquired into the allegation that the officers were allowed to use their regular working hours to assist the campaign and then work overtime to complete their regular duties, receiving additional pay for that overtime. The investigation team identified Captain Anthony Serra and Assistant Deputy Warden David Schoenfield—the supervisors in charge of the administration and personnel offices at AMKC—as the individuals who might have organized the scheme. The investigation team also inquired into the involvement of other people working in the administration and personnel offices, including plaintiffs Parks and Muench.

Defendants contend that documents relevant to the investigation that were maintained in the personnel and administration offices were being destroyed. Plaintiffs assert that no documents were destroyed. As a result of their suspicions of document destruction, investigators searched the personnel office to secure as many relevant documents as possible. Plaintiffs assert that the investigators searched their personal work spaces and confiscated Rolodexes and a photograph of Soto with Governor Pataki. Defendants do not address this allegation. It is undisputed that the investigators took time cards, requests for emergency days off, personnel records and requests for transfers.

On November 30, 1994, Acosta was told to report to the Investigative Division to be interviewed. The volition of his appearance is disputed. Defendants maintain that the Investigative Division had been informed that Acosta wanted to provide information regarding the allegations that Captain Serra misused funds. Plaintiffs counter that Acosta was ordered to appear. It is undisputed that Acosta provided no information in the

interview. Defendants contend that the Investigative Division was concerned that Acosta was pressured into saying nothing, so in an attempt to keep him from tainting others who might otherwise cooperate, Acosta was transferred on December 1, 1994, to the Correctional Facility for Men ("CIFM"), another Rikers Island facility. Plaintiffs assert that the investigative team was angered that he provided no information, and so transferred Acosta in retaliation for working on the Pataki Campaign and then not providing information to the investigation.

On December 12, 1994, plaintiffs Soto, Muench, Parks and Ruiz were transferred to different worksites pending the conclusion of the investigation. Ruiz was transferred to CIFM, like Acosta. Soto was transferred to the Otis Bantum Correction Center ("OBCC") and was not given a steady tour or post, but rather rotates in different positions and works different hours which, she alleges, hurts her child care arrangements and means she cannot spend regular time with her children. Nothing in the record indicates the facility to which Parks and Muench were transferred. Six other corrections officers who also worked in the administration and personnel offices and had worked on the Pataki Campaign were not transferred.

The parties dispute the motivation behind the transfers. Defendants contend that they were unable to obtain all the information they needed from the personnel and administrative offices and a search of the computer at the personnel office showed that computer files had been destroyed. Plaintiffs dispute that computer files were destroyed. The investigative team wanted everyone in the personnel office to be transferred to protect the integrity of the investigation. Plaintiffs maintain that the motive for the transfer was to retaliate for plaintiffs' work on the Pataki Campaign, and not to preserve the integrity of the investigation.

In her deposition, Rigby described the decision process for determining who should be transferred. In addition to protecting the investigation, Rigby testified that the transfers occurred because there was a new deputy warden in the facility and he wanted to change the staff in the personnel office. She stated that transfers often occur when senior management changes because the new manager wants to have staff that he or she knows. Rigby stated that a number of corrections officers were transferred out of the personnel office for this purpose, and that those people included some of the plaintiffs. The warden and the deputy warden determined who, from their point of view, could be most readily replaced and therefore should be the first to be transferred. The list that came out of that discussion was shared with Daly. Daly authorized the transfer of the plaintiffs, based on the recommendation of the wardens that had been forwarded by Rigby. Rigby testified that apart from Acosta, she did not have any input into which specific individuals should be transferred. Although she does not say so explicitly, the inference is that she recommended that Acosta be transferred and the other four plaintiffs were selected by the warden and deputy warden as officers that should be transferred. Other than a memorandum executing the transfer, plaintiffs do not provide any support for their allegation that Rigby identified which individuals, apart from Acosta, should be transferred.

In their final report, the investigative team concluded that no corrections officers were threatened or coerced into working on the Pataki Campaign. The investigative team did, however, charge several corrections officers with violating time and leave regulations when they picked up and dropped off cars they rented to work on the Pataki Campaign. Plaintiff Muench was charged with misusing departmental resources on election day. Muench pled guilty to these charges and was disciplined with a loss of two vacation days. The investigative team also filed charges against five other officers for violating departmental regulations when renting cars to use on the Pataki Campaign. These five officers entered into plea agreements for lesser charges.

Plaintiffs Soto and Acosta filed an action on January 20, 1995, pursuant to Sections 1983 and 1985 of Title 42, United States Code, alleging that defendants conspired to retaliate against them for their exercise of their First Amendment rights. Plaintiffs

Muench, Parks and Ruiz filed an action on January 25, 1995, alleging the same violations. At the request of the parties, this Court consolidated the cases on August 2, 1996. All plaintiffs seek injunctive and declaratory relief and monetary damages.

## STANDARD

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In making this judgment, the burden is on the moving party, and all facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts which demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

The Court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only when a plaintiff "can prove no set of facts in support of [his] claim that would entitle [him] to relief." *Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Constr. Auth.,* 23 F.3d 636, 639 (2d Cir.1994). In reviewing a motion to dismiss, the court must accept as true all allegations in the Complaint. *Annis v. County of Westchester,* 36 F.3d 251, 253 (2d Cir.1994). Only if, assuming all facts as true, plaintiff still fails to plead the basic

1. The caption of the Complaint filed by Muench, Parks and Ruiz lists the defendants name and then states "as _____," giving the appropriate title for that individual. The caption of the Complaint filed by Soto and Acosta merely lists the name of the individual defendant and then gives that person's title.

2. In a suit against state officials—which is construed as a suit against the state itself, *Gan v.*

elements of a cause of action can the Court dismiss the claim.

## DISCUSSION

A. *Individual Versus Official Capacity*

■ As an initial matter, this Court must determine whether the Complaints are filed against the named individuals in their official or individual capacity, or both. The caption in the Muench Complaint clearly indicates that the individuals have been sued in their official capacity. It is unclear from the caption in the Soto Complaint under which capacity plaintiffs are suing the named individuals.[1] The body of the Complaint filed by Soto and Acosta, however, refers to the individual defendants "acting in their official capacities as employees" of the City and DOC. The Supreme Court has held that such language is an indicator of an intent to sue an individual in his or her official capacity. *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991).

The course of proceedings in this case does not alter the conclusion that the plaintiffs have sued each of the individual defendants in their official capacity. *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993). In the instant case, the parties' papers do not discuss defendants' liability in their individual capacity. Since this is a suit against a municipality and not a state, the Eleventh Amendment is not triggered. *Monell v. Department of Soc. Serv. of the City of New York,* 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978). Therefore, whether the parties are seeking monetary versus injunctive relief is not a guide to whether they are suing the individual defendants in their official or individual capacities because under Section 1983 local governments can be sued directly for monetary, declaratory, or injunctive relief.[2] *Id.* at

*City of New York,* 996 F.2d 522, 529 (2nd Cir. 1993)—unless the state has waived its Eleventh Amendment immunity or Congress has overridden it, a party cannot recover monetary damages. *Yorktown Medical Laboratory v. Perales,* 948 F.2d 84, 89 (2nd Cir.1991). Thus, if a party seeks monetary damages, the suit should be construed as one against the state official in his or her individual capacity.

690, 98 S.Ct. at 2035. Moreover, the parties' discussion throughout their motion papers centers on defendants' liability as officials. For these reasons, I find that both actions were brought against the individual defendants only in their official capacity.

### B. *Section 1983 Claim*

#### 1. *Standard*

Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. There are two distinct parts to a Section 1983 claim: first, whether plaintiffs have alleged that a person acting under color of state law has deprived the plaintiffs of a right, privilege, or immunity secured by the Constitution or laws of the United States, *see Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993); and second, whether the various defendants may be held liable for that action based on the requirements of *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. Additionally, to recover compensatory damages, plaintiffs must demonstrate actual injury. *Farrar v. Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992) (citing *Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978)).

This Court must first determine whether the actions by the defendants amounted to a constitutional deprivation. Indeed, "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995).

As a second matter, this Court must determine whether each of the defendants—a municipality, a municipal agency, and municipal officials sued in their official capacity—can be held liable for these actions. This inquiry really focuses on the liability of the municipality and its agency because a suit against individual defendants in their official capacity is construed as a suit against the municipality. *Frank,* 1 F.3d at 1326 ("the real party in interest in an official capacity suit is the governmental entity and not the named official") (quoting *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361). If plaintiffs had sued the individual defendants in their personal capacities, then this Court would discuss their liability separate from municipal liability, *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361—a liability that turns on personal involvement.[3]

▉ To find New York City and the Department of Corrections liable under Section 1983, plaintiffs must demonstrate that a governmental policy of discrimination injured plaintiffs. A municipality and its agencies may not be held liable under a respondeat superior theory, but may be held liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694, 98 S.Ct. at

---

**3.** As a prerequisite to maintaining a Section 1983 action against an official in their personal capacity, a plaintiff must allege a defendant's direct or personal involvement in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Liability for damages in a Section 1983 action may not be based on the *respondeat superior* or vicarious liability doctrines. *See Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. Supervisors, however, may be found liable under Section 1983 in the following circumstances:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defen-

dant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the [violation of rights] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Wright,* 21 F.3d at 501).

2037; *Walker v. City of New York,* 974 F.2d 293, 294 (2d Cir.1992). In this regard, the Supreme Court has set forth a number of guiding principles:

> First, . . . municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480 [106 S.Ct. at 1298]. Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id.* at 483 [106 S.Ct. at 1300] (plurality opinion). Third, whether a particular official has "final policymaking authority" is a question of *state law. Id.* (plurality opinion) Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business. *Id.* at 482–483, and n. 12 [106 S.Ct. at 1299–1300, and n. 12] (plurality opinion).

*City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (internal citations to *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (emphasis in original)).[4] The individuals who have policymaking authority can be identified by their receipt of such authority through express legislative grant, or through their delegation of policymaking authority from those to whom the power has been expressly granted. Alternatively, a municipal policy may be found where there is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnik,* 485 U.S. at 126–27, 108 S.Ct. at 926 (internal quotation marks omitted).

Finally, a single act generally cannot provide the basis for municipal liability, unless that act was the decision of a municipal policymaker. *Pembaur,* 475 U.S. at 480,

106 S.Ct. at 1298. If the action at issue was taken by a municipal employee who is not a final policymaker, "the city could be liable only for the policymaker's delegation and supervision, not the subordinate's exercise of authority." *Walker,* 974 F.2d at 296 (citing *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926). And, of course, a municipality is liable where the policymaker ratifies a subordinate's decisions or acts. *Id.* Again, the test is whether there is a municipal policy or custom. As the Second Circuit has stated,

> [i]n order to hold a municipality liable under § 1983 for the conduct of employees below the policymaking level, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy or custom.

*Dwares,* 985 F.2d at 100 (internal quotations and citations omitted). Such a policy may be proven by inference, such as an inference that the municipality failed to train its employees and this failure led to the violation at issue. *Id.* As the Second Circuit stated in *Dwares,*

> the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused plaintiff's injury. A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy.

*Id.*

### 2. *Discussion*

Plaintiffs allege that defendants transferred the plaintiffs in retaliation for their work on the Pataki Campaign, in violation of their First Amendment rights. The parties agree that a retaliatory transfer would violate the First Amendment. In a series of cases, the Supreme Court has held that a nonpolicymaking public employee is protected from employment decisions based on the

---

4. The determination of whether individual actors hold policymaking authority is a question of law for the judge to decide. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *Frank,* 1 F.3d at 1327; *Philippeaux v. North Cent. Bronx Hosp.,* 871

F.Supp. 640, 652–53 (S.D.N.Y.1994) (DLC) (discussing interplay of *Monell, Jett,* and Sections 1981 and 1983), *aff'd* 104 F.3d 353 (2d Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 1110, —— L.Ed.2d —— (1997).

employee's political beliefs or associations. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75, 110 S.Ct. 2729, 2737, 111 L.Ed.2d 52, *reh'g denied*, 497 U.S. 1050, 111 S.Ct. 13, 111 L.Ed.2d 828 (1990); *Branti v. Finkel*, 445 U.S. 507, 515–17, 100 S.Ct. 1287, 1293–94, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 372–73, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). *See also O'Hare Truck Serv., Inc. v. City of Northlake*, —— U.S. ——, ————, 116 S.Ct. 2353, 2357–58, 135 L.Ed.2d 874 (1996). As the Supreme Court stated in *Elrod*, "political belief and association constitute the core of those activities protected by the First Amendment." *Elrod*, 427 U.S. at 356, 96 S.Ct. at 2681. This protection also extends to adverse employment decisions that fall short of dismissal, including transfers. *Rutan*, 497 U.S. at 75, 110 S.Ct. at 2737. This protection, however, is not absolute. The government may intrude on these rights where there are compelling reasons to do so. *Rutan*, 497 U.S. at 76, 110 S.Ct. at 2738. Thus, those rights "may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti*, 445 U.S. at 517, 100 S.Ct. at 1294. The Supreme Court has held, however, that such employment decisions may be upheld only if the decisions "are narrowly tailored to further vital government interests." *Rutan*, 497 U.S. at 74, 110 S.Ct. at 2736.

Recently, the Second Circuit discussed expressive association, which includes affiliation with a political party, finding it

> protects the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances.

*Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir.1997). The Second Circuit held that

> [b]ecause the right to associate is part of the complex of those First Amendment freedoms that undergird our free society, any governmental attempt to limit it is subject to the closest scrutiny.

*Id.* at 998.

■ In the context of employment decisions, the appropriate test for a violation of the First Amendment is (1) whether the conduct at issue is protected by the First Amendment, and (2) whether that protected activity was a motivating or substantial factor in defendants' employment decision. *Bernheim v. Litt*, 79 F.3d 318, 324 (2d Cir. 1996) (citations omitted). Once the plaintiff has made this initial showing, the defendant must show that it would have made the same decision in the absence of the protected conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). While many courts use this test for alleged violations of freedom of speech, it is also used when the protected activity is freedom of association. *See, e.g., Meyers v. Simons*, 896 F.Supp. 132, 135–36 (S.D.N.Y.1995); *DeGennaro v. New York City Hous. Auth.*, 1995 WL 37850, at *3 (S.D.N.Y. Jan 31, 1995).

While it is undisputed that the conduct at issue is protected by the First Amendment, the parties do dispute the intent and motivation of defendants' transfer of plaintiffs. Plaintiffs contend that the defendants' decision to transfer the plaintiffs was motivated by or based in substantial part on a desire to retaliate against plaintiffs for the exercise of their right to expressive association. Defendants contend that plaintiffs' work for the Pataki Campaign was not the motivation or a substantial factor in the decision to transfer them. To affirm the existence of a material issue of disputed fact with regard to this disagreement, plaintiffs cite to their depositions in which they note that their work areas were searched and that they had satisfactory records before the transfers. Plaintiffs also cite to Rigby's deposition in which she testified that initially there were two lists of employees to be transferred to the different facilities, and yet only the five plaintiffs—all of whom worked on the Pataki Campaign—were transferred. Defendants note that other corrections officers who also worked on the Pataki Campaign and were in the personnel and administration offices of the AMKC were not transferred. Based on this disagreement and the facts asserted by both parties, I find that defendants have not demonstrated that there is no genuine issue

for trial with regard to the First Amendment violation.

■ Turning to the second part of the test for a Section 1983 claim, plaintiffs must establish liability under *Monell.* Plaintiffs have not pointed to the existence of a New York City policy or custom to transfer employees on the basis of their political beliefs or associations. Such a policy is essential to a finding of municipal liability. *Praprotnik,* 485 U.S. at 128, 108 S.Ct. at 926. Plaintiffs have not demonstrated that there was anything more than a single decision to transfer certain individuals in the context of a specific investigation. Moreover, it is undisputed that some corrections officers who worked in the offices under investigation and also worked on the Pataki Campaign were not transferred. Thus, there was not a policy to transfer an employee who worked for the Pataki Campaign.

■ Additionally, plaintiffs have not demonstrated that the officials identified in the action have final policymaking authority such that they can subject the municipality to suit. Plaintiffs must demonstrate that the named officials have policymaking authority under state law. As noted above, an individual may gain such authority through express legislative grant or by a delegation of policymaking authority from those to whom the power has been expressly granted. *Id.* at 126, 108 S.Ct. at 925.

The first avenue is the only viable option for plaintiffs, as there is no evidence of a delegation of policymaking power. The New York City Charter vests final policymaking authority in the Mayor and the City Council. N.Y. City Charter §§ 3, 8(a), 21, 28. The Charter vests policymaking authority with respect to personnel decisions with the Personnel Director. N.Y. City Charter §§ 814(d), 817. *See City of New York v. City Civil Serv. Comm'n,* 60 N.Y.2d 436, 470 N.Y.S.2d 113, 116, 458 N.E.2d 354, 357 (1983) (holding that the Personnel Director "has both the policymaking authority and functional responsibility for civil service matters in New York City"). Plaintiffs cite Sections 810(b), 813 and 814 as support for the argument that agency heads may establish policy for their agencies, including personnel policy.

I find this argument unpersuasive. Those Sections vest policymaking authority in agency heads for policies related to the programmatic purpose of that agency, but not for personnel matters. Other courts in this Circuit have held that the Mayor, the City Council and the Personnel Director are the final policymakers with regard to personnel decisions, not agency heads. *Costello v. McEnery,* 1994 WL 524980, at *5 (S.D.N.Y. Sept.26, 1994); *Davis v. City of New York,* 1990 WL 165763, at *11–14 (S.D.N.Y. Oct.22, 1990) (drawing on an older version of the Charter but reaching same result). Moreover, the power to make employment decisions alone does not in itself give rise to potential Section 1983 liability. "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the acts of the municipality." *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926 (mid-level supervisor who retaliates against an employee in violation of City Charter is not setting city policy so as to give rise to Section 1983 liability); *see also Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 573, 577 (2d Cir.1989) (project superintendent's discretion in training and evaluation did not constitute policymaking authority of the Housing Authority). Since an agency head does not have final policymaking authority for personnel policy, I find that plaintiffs have failed to establish liability under *Monell.*

For the above reasons, plaintiffs have failed to establish that the individuals are liable. As a matter of law, I find that none of the defendants are liable for the actions at issue and therefore grant defendants' motion for summary judgment on plaintiffs' claim under Section 1983.

## C. *Section 1985 Claim*

■ Plaintiffs allege a violation of Section 1985 of Title 42, United States Code. In relevant part, that Section provides that:

> If two or more persons in any State … conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of

the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Section 1985 creates no substantive rights, but merely provides a remedy for conspiracies to violate a person's right to equal protection of the laws. *See United Brothers of Carpenters & Joiners of Am., Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983); *Great Am. Fed. Savings & Loan v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979).

 To assert a claim under Section 1985(3), plaintiffs must allege that the defendants have, with racial or other class-based discriminatory animus, conspired to deprive them of a constitutional or other federal right. *See LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 426–27 (2d Cir.1995); *Spencer v. Casavilla*, 903 F.2d 171, 175 (2d Cir.1990). Plaintiffs must also demonstrate that they suffered damages as a result of defendants' actions. *Katz v. Klehammer*, 902 F.2d 204, 207 (2d Cir.1990); *Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir.1989) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971)). In the context of First Amendment violations, however, the Second Circuit has held that

> [s]ince the loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury, the victim of a conspiracy to violate First Amendment freedoms has standing to bring suit before the conspiracy has resulted in economic or tangible injury.

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir.1995) (citing *Monell*, 436 U.S. at 690–94, 98 S.Ct. at 2035–38) (citations omitted). Finally, plaintiffs must allege these elements with particularity. *Leon v. Murphy*, 988 F.2d 303, 310–11 (2d Cir.1993).

Since plaintiffs have not alleged racial or class-based animus, the elements of conspiracy with particularity, and have not opposed defendants' motion to dismiss the Section 1985 claim, that motion is granted.

## CONCLUSION

For the reasons given above, it is hereby

ORDERED that defendants' motion for summary judgment on plaintiffs' Section 1983 claim is granted.

IT IS FURTHER ORDERED that defendants' motion to dismiss plaintiffs' Section 1985 claim is granted.

IT IS FURTHER ORDERED that the Clerk of Court shall close the case.

SO ORDERED.