Elizabeth MESCALL, Plaintiff,

v.

Reginald F. MARRA, individually, and Yonkers City School District, Defendants.

No. 98 Civ. 0017 WCC.

United States District Court, S.D. New York.

June 11, 1999.

Lovett & Gould, White Plains, New York, NY, Jane Bilus Gould, of counsel, for plaintiff.

Querrey & Harrow, Ltd., New York City, NY, Mark J. Krone, of counsel, for defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Elizabeth Mescall ("Mescall") brings this action against the Yonkers City School District, her former employer (the "District"), and Reginald F. Marra, the District Superintendent, individually ("Marra"), alleging that she was wrongfully denied tenure in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12217, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the First Amendment of the United States Constitution.[1] Defendants moved for summary judgment on all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. On May 26, 1999, we issued an Order granting in part and denying in part the relief sought, indicating that we would file this opinion shortly thereafter explicating our reasons for the Order.

## BACKGROUND

The following facts are undisputed unless otherwise stated. Mescall commenced employment with the District for a three-year probationary term as a guidance counselor on September 8, 1994. During the 1994/95 school year, she worked two days per week at the Early Childhood Center and three days per week at the Enrico Fermi Elementary School. That year, Wendy London, Principal of the Early Childhood Center, Janet Rosenblatt, Assistant Principal of the Early Childhood Center, and Charles Whelan, Principal of the Enrico Fermi Elementary School rated Mescall's job performance as satisfactory in their written performance reviews. However, the District records and Mescall's Annual Evaluations indicate that she was absent seventeen days during the school year. Mescall does not dispute the number of absences recorded during her first probationary year.[2] She does, however, deny that Ms. London approached her to discuss the issue of attendance.

For the 1995/96 school year, Mescall transferred to the Foxfire Elementary School. Ms. London also left the Early Childhood Center to become Principal of Foxfire. Between November 1, 1995 and December 15, 1995, Mescall was absent five days. Then on December 18, 1995, she was involved in a car accident. As a result of the accident, Mescall complained of back and neck pain, as well as depression, anxiety and fear of driving. In January of 1996, Mescall was absent for nine days which she attributes to a fall on some ice. In April of 1996, Mescall claims that she re-injured her neck when reaching for a box on a high shelf, causing her to be bed-ridden and unable to walk, for three

---

1. Mescall voluntarily dismissed all ADA claims asserted against Marra. *See Harrison v. Indosuez,* 6 F.Supp.2d 224, 229 (S.D.N.Y. 1998) (supervisory employees may not be held individually liable under the ADA) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995) (Title VII)).

2. Mescall attributes these absences to assorted "bugs" picked up at school, colds, bronchitis, and conjunctivitis for which she provided the District with documentation (*i.e.,* doctors' notes). Defendants call attention to the fact that fourteen of these absences were immediately before or after a weekend or holiday.

days.[3] In total, Mescall was absent twenty-one days during the 1995/96 school year.[4]

Although Mescall's 1995/96 Annual Evaluation was again satisfactory, Ms. London commented as follows, "I would caution Mrs. Mescall regarding her absences. Although she was able to bring in medical notes, they are excessive, particularly following holidays. Attendance should improve dramatically next year." Ms. London also mentioned that "[t]here were times when Mrs. Mescall was hesitant or refused to work with a particular youngster." This apparently refers to Mescall's refusal to work with a kindergartener who had previously thrown a chair across a room and thrown himself at Mescall, aggravating her back injury. Despite Ms. London's directive that Mescall assist a teacher's aid in a classroom during recess, Mescall refused to enter the classroom because the physically assaultive child was present.

When Mescall explained that she was not required to be in the classroom during recess, Ms. London told Mescall to contact the union for guidance on the issue. Mescall subsequently contacted John Eshoo ("Eshoo"), Vice President of the Yonkers Federation of Teachers (the "Union"), who advised Mescall that she was not contractually obligated to do "lunch duty."

For the 1996/97 school year, Mescall transferred to P.S. 21 where she spent her third and final probationary year as a guidance counselor. In September 1996, Ana Celia Delgado ("Delgado"), the Principal of P.S. 21, and J. Menkes Castronova, the Assistant Principal, distributed a memorandum to all non-tenured teachers requiring them to submit lesson plans. In addition, Delgado asked Mescall to deliver a classroom presentation every day. Mescall contacted Eshoo to inquire whether she was contractually obligated to prepare lesson plans and daily classroom presentations. Eshoo advised Mescall that, although not contractually obligated to do so, she should obey her Principal's directives, and let the Union address her complaints through the grievance process.[5] Eshoo then contacted Paul Citarella ("Citarella"), the District's Director of Personnel who, in turn, contacted Delgado.[6] Mescall alleges that Delgado reprimanded her for contacting the Union and threatened to rate her performance as unsatisfactory if she continued to bring the Union into the building.[7] Mescall further alleges that Delgado commented about Mescall's union affiliation in front of another school employee.

In the fall of 1996, in response to the complaints of Mescall and other teachers at P.S. 21, Walter Tice ("Tice"), the President of the Union, Eshoo and Lynn Edelstein ("Edelstein") distributed anonymous

---

3. Mescall concedes that she is not disabled under the ADA as a result of any physical impairments caused by the December, 1995 car accident or injuries sustained in January and April, 1996. She also acknowledges that prior to her employment with the District, she did not have any physical or mental condition that interfered with her ability to work as a guidance counselor.

4. Here again, fourteen absences occurred immediately before or after a weekend or holiday, and Mescall provided doctors' notes for each.

5. Mescall did not follow Eshoo's advice. Rather, she refused to comply with Delgado's lesson plan and presentation requirements. Mescall has informed the Court that a griev-

ance was filed by the Union with respect to the lesson plan requirements.

6. Eshoo advised Citarella that an arbitration decision had already been issued to the effect that guidance counselors are not required to "teach" and therefore cannot be ordered to make classroom presentations everyday.

7. Mescall reported this incident to Eshoo who inquired as to Mescall's willingness to testify regarding Delgado's anti-union statements if necessary. Mescall also reported the exchange to Lynn Edelstein, the elementary school's Union representative, because there was no P.S. 21 Union representative that year. Eshoo has testified that no one was willing to volunteer as a representative because they feared retaliation by Delgado.

questionnaires to the staff of P.S. 21 to inquire about Delgado's anti-union activities. Edelstein then summarized the responses and prepared discussion notes for a conference with Betsey Hardeman ("Hardeman"), the District's Deputy Superintendent. At the end of October, 1996, Tice and Edelstein informed Hardeman of their findings regarding Delgado's anti-union stance, the fear among the faculty, and Delgado's practice of confronting staff members who have contacted the Union. Hardeman said that she would look into the matter but never notified Edelstein of any action taken by the District.

Eshoo met face-to-face with Hardeman on November 6, 1996 and November 18, 1996 to discuss again the Union's concerns. Without mentioning Mescall by name, Eshoo discussed her previous confrontation with Delgado and asked Hardeman to speak with Delgado about her anti-union statements to the staff. Again, Hardeman failed to apprise the Union of any action taken in this regard.

Mescall claims that in or around January of 1997, her mental impairment (*i.e.*, stress, depression and anxiety) became disabling, causing her to suffer from rashes, hives, dizzy spells and fainting. She attributes the increasing severity of her mental condition to her father's diagnosis of stage-C colon cancer, and to working under Delgado.[8]

Two more confrontations between Mescall and Delgado occurred in early February 1997. In one instance, Mescall was called into Delgado's office to discuss a report by Sylvia Zaluski, Mescall's program coordinator, that Mescall had presented an untimely, off-topic and disorganized classroom presentation. The other

incident concerned Delgado's request that Mescall work with a group of students during recess. Mescall refused to hold what she characterized as detention on the grounds that her contract prohibited "lunch duty" and the disciplinary nature of detention would interfere with her relationship with the students. Delgado claimed that it was a voluntary group counseling session and again reprimanded Mescall for her insubordination. Mescall further alleges that she was once again berated for her union involvement and threatened with a denial of tenure. As a result of this confrontation, Mescall broke out in hives and went to the emergency room complaining of stress, anxiety, dizziness and fainting spells. On the recommendation of her doctor, Mescall did not return to work at P.S. 21.[9] The District hired a guidance counselor to assume Mescall's duties.

As of February 18, 1997, Delgado's anti-union behavior was still being discussed at the Union Board meeting. P.S. 21 staff members indicated to Union representatives Edelstein and Rita Seligman on February 26, 1997 that they feared negative repercussions from Delgado if they contacted the Union. On March 5, 1997, Union President Tice met with Hardeman and Delgado to discuss the reports of Delgado's anti-union behavior.[10] Although Delgado denied the allegations, Hardeman advised Tice that Delgado would be required to retract any such statements at the upcoming faculty meeting. Delgado did make a statement at the March 20, 1997 faculty meeting regarding the discouragement of union activity, however, the Union representatives were dissatisfied with its content.

8. Despite the alleged personal and professional friction, after observing one of Mescall's group counseling sessions on January 13, 1997, Delgado issued a written evaluation that complemented Mescall on her performance.

9. The District records reflect that she was absent from February 19, 1997 through March 2, 1997, and was granted a medical

leave of absence from March 3, 1997 through June 3, 1997.

10. It is Delgado's recollection that this meeting was between herself, Hardeman and Marra rather than Tice. *See* Deposition Transcript of Ana Celia Delgado ("Delgado Dep.") at 128–29.

Meanwhile, on or about February 26, 1997, Mescall wrote to Citarella requesting an accommodation in the form of an open-ended medical leave of absence to commence on March 3, 1997. On or about March 15, 1997, Citarella spoke with Mescall over the phone to discuss the status of her tenure review, as well as the details of her proposed leave of absence. This conversation was tape recorded by Mescall. Citarella informed Mescall that her absences during her probationary period had been excessive and, in light of the District's attendance policy, she would not be recommended for tenure.[11] Mescall claims that Citarella proceeded to inform her that she would not be granted a medical leave of absence. Citarella does not recall telling Mescall that her requested accommodation would be denied, but rather believes he told her to file the necessary paperwork.

Thereafter, Mescall wrote to Citarella requesting that he reconsider her request for leave and advising that her doctors assured her she would be able to return to work by June 3, 1997. By letter dated April 7, 1997, Mescall was notified that the District had granted her medical leave from March 3, 1997 through June 3, 1997.

On March 13, 1997, Delgado prepared a Probationary Review Report wherein she recommended against Mescall's continued employment with the District, citing Mescall's poor attendance record, failure to follow directives and suggestions regarding classroom presentations and counseling groups, arbitrary planning of classroom presentations, and delay in processing referrals. Reference was also made to Ms. London's previous evaluation concerning Mescall's refusal to work with the kindergartener. Delgado's report was subsequently placed in Mescall's personnel file and reviewed by Citarella, Hardeman and Marra.

Despite the fact that Mescall's illnesses and indispositions had been documented, Hardeman claims that she considered the absences to be excessive and therefore recommended against Mescall's receiving tenure.[12] Although the District has no formal written policy establishing a limit on acceptable absences, Mescall was aware that the District had a strict attendance policy which would be an important consideration in any tenure decision.[13] By letter dated May 8, 1998, Marra informed Mescall that he would recommend to the Board that she not receive tenure and that her employment as a probationary teacher in the District would therefore be terminated effective July 31, 1997.

On Mescall's behalf, the Union requested a written explanation for Marra's adverse recommendation and an informal hearing to address the issued raised therein. The following reasons were given by Marra in support of his decision: (1) excessive absences, particularly following holidays; (2) failure to improve attendance from the prior year; (3) hesitancy or refusal to work with a particular youngster; (4) arbitrary planning of classroom presentations; (5) lack of timeliness in addressing referrals; and (6) disregard of professional directives and suggestions.

Mescall responded to Marra by letter stating that: (1) all prior absences had been documented medical absences; and

---

11. Citarella's remarks were based upon his review of Mescall's personnel file. He had not yet received a copy of Delgado's tenure review report but believes he may have spoken with her over the telephone about Mescall.

12. Hardeman recalls a conversation with Delgado wherein Delgado indicated that she was inclined to recommend that Mescall receive tenure despite her poor attendance record because her absences had been medically documented. Hardeman advised Delgado that the reasons for such absences were not to be considered.

13. Union President Tice had advised Mescall that she could be denied tenure on the basis of her absences. Deputy Superintendent Hardeman has testified that as little as two or three absences during a probationary year could adversely affect a tenure determination, notwithstanding proper medical documentation.

(2) she did not suffer from a permanent physical disability. She denied any shortcomings in her performance and suggested that any insubordination was the result of Delgado's improper, contract-violative and unprofessional demands. She also recounted the incident when Delgado allegedly threatened to recommend against tenure because of Mescall's involvement with the Union.

At the hearing in June of 1997, Tice and Eshoo argued that Mescall had received all satisfactory reviews with the exception of Delgado's 1996/97 review, and all absences had been for medical reasons that were documented to the District. According to Mescall, neither Tice nor Eshoo ever contended that Delgado's adverse recommendation was in retaliation for Mescall's union activities. On June 16, 1997, Eshoo informed Mescall that Marra was not going to reverse his decision.[14]

On June 18, 1997, Mescall's attorney notified Marra by letter that he was filing a charge with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation in violation of the ADA and cautioned Marra against recommending to the Board of Education that Mescall's employment be terminated. On June 19, 1997, Mescall filed a charge with the EEOC, Charge No. 160971886, alleging that she had been denied an accommodation for her mental disability and that her employment had been terminated due to her disability-related absences and/or in retaliation for her request for accommodation. She was issued a Notice of Right to Sue on October 9, 1997. The instant action was commenced on January 5, 1998 by the filing of a complaint alleging disability discrimination and retaliation in violation of the ADA, and a violation of Mescall's First Amendment right of freedom of association and the right to petition government for the redress of grievances, in violation of 42 U.S.C. § 1983.

Mescall has been working as a guidance counselor at Middle School 135 in New York City since November, 1997 and admits that she has no physical or mental disabilities requiring an accommodation in order for her to perform her present job.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. See Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505. While caution is to be exercised in granting summary judgment where intent or state of mind is in issue, see Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994), summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149 (2d Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### II.  Plaintiff's Claims Under the ADA

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to ... advancement, or discharge of employees." 42 U.S.C. § 12112(a). When consid-

---

**14.** Delgado has since been granted tenure by the District, despite an initially unsatisfactory review by her immediate supervisor, Unit Director Sarah Butler.

ering discrimination claims brought under the ADA, courts in this circuit apply the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998). Under the *McDonnell Douglas* framework, the plaintiff "must initially come forward with facts sufficient to establish a prima facie case that [her denial of tenure] was effected under circumstances giving rise to an inference of discrimination." *Greenway*, 143 F.3d at 52. The establishment of a prima facie case gives rise to the rebuttable presumption that the employer discriminated against the employee in an unlawful manner. *See id.* (citing *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)). The burden of production then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the employer satisfies this burden, the presumption of discrimination is rebutted. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff must then prove, by a preponderance of the evidence, that the defendant's proffered explanation was not its true reason, but was a pretext for discrimination. *See id.; Greenway*, 143 F.3d at 52.

■ In order to establish a prima facie case of employment discrimination under the ADA, Mescall must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she suffered the alleged adverse employment action because of her disability. *See*

*Reeves*, 140 F.3d at 149–50; *see also Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994). The District does not dispute that it is subject to the ADA. It contends, however, that Mescall has failed to establish that she is "a qualified individual with a disability" under the ADA, or that she was denied tenure because of her disability.

### A. "Disability" Within the Meaning of the ADA

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Mescall claims that she was disabled because she had a mental impairment that substantially limited the major life activity of working.[15]

The EEOC regulations interpreting the ADA define a "mental impairment" as "any mental or psychological disorder, such as ... emotional or mental illness." 29 C.F.R. § 1630.2(h)(2). The record shows that, at the time Mescall requested a leave of absence, she was suffering from depression, panic attacks and was exhibiting dermatologic symptoms associated with stress.[16] The parties do not dispute that such a condition constitutes a "mental impairment" for purposes of the ADA. *See, e.g., Zirpel v. Toshiba America Info. Sys., Inc.*, 111 F.3d 80, 81 (8th Cir.1997) (panic disorder constitutes a mental impairment); *Adams v. Rochester General Hosp.*, 977 F.Supp. 226, 232 (W.D.N.Y.1997) (depression qualifies as mental impairment). However, the District argues that Mes-

---

**15.** The "major life activities" within the meaning of the ADA are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(i). Mescall concedes that the only

major life activity substantially limited by her impairment was working. *See* Pl's Mem. at 19–20.

**16.** *See* Deposition Transcript of Dr. Donald Lupiani ("Lupiani Dep.") at pp. 13–15, 23–26.

call's mental impairment did not "substantially limit" her major life activity of working.

To prove that an impairment substantially limits the major life activity of working, a plaintiff must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* Here, plaintiff contends that, as of February 1997, she could not work at all. However, there is no evidence in the record to support this statement. Indeed, the evidence overwhelmingly suggests that Mescall was only incapable of working as a guidance counselor at P.S. 21 under the supervision of Delgado.

By her own admission, Mescall's mental impairment was caused or exacerbated by her interaction with Delgado, resulting in her doctor's recommendation that she not return to work at P.S. 21.[17] Mescall's inability to work as a guidance counselor under the supervision of Delgado does not constitute a disability within the meaning of the ADA. *See Siemon v. AT&T Corp.,* 117 F.3d 1173, 1174–1176 (10th Cir.1997) (plaintiff forced to take disability leave because of severe depression and anxiety resulting from personality conflict with antagonistic supervisor held not disabled under ADA); *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524–25 (7th Cir.1996) (supervisor's threatening tone and aggressive behavior in job performance review caused anxiety and depression but major life activity of working not substantially impaired just because plaintiff cannot work under certain supervisor); *Paleologos v. Rehab Consultants, Inc.,* 990 F.Supp. 1460, 1465 (N.D.Ga.1998) (stress

condition triggered by mere thought of interaction with defendant's management does not constitute a disability under the ADA); *Stroman v. Blue Cross and Blue Shield Ass'n,* 966 F.Supp. 9, 11 (D.D.C. 1997), *aff'd,* 159 F.3d 637, 1998 WL 230211 (D.C.Cir.1998) (inability to work for a particular supervisor does not qualify as disability).

Indeed, in November 1997, plaintiff went back to work as a school guidance counselor in a different school district. Since her employment at Middle School 135, plaintiff has not been absent because of anxiety, stress or depression and claims to have no mental impairment that interferes with her ability to perform her duties as a guidance counselor. Thus, it is clear that her mental impairment does not preclude her working in her chosen profession. Mescall "manifestly 'retains the ability to compete successfully with similarly skilled individual and no facts indicate that [s]he is unable to perform a class of jobs nor a broad range of jobs.'" *Dupre v. Harris County Hosp. Dist.,* 8 F.Supp.2d 908, 918 (S.D.Tex.1998) (citing *Hamilton v. Southwestern Bell Tel. Co.,* 136 F.3d 1047, 1051 (5th Cir.1998)); *see also Stroman,* 966 F.Supp. at 11 (no disability where plaintiff was able immediately to obtain similar employment).

Even assuming that Mescall was incapable of performing a broad range or class of jobs from February 1997 through June 3, 1997, the date that Mescall claimed she would be able to return to work at P.S. 21, such a temporary mental condition would not qualify as a disability under the ADA. *See Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999) (citing 29 C.F.R. Pt. 1630, App. § 1630.2(j) for proposition that "temporary, non-chronic impairments of short duration, with little or no permanent long-term impact, are usually not disabili-

---

**17.** *See* Deposition Transcript of Elizabeth Mescall ("Mescall Dep.") at pp. 68–69, 104–   05, 136, 442.

ties"); *see also Hamilton,* 136 F.3d at 1050–51 (work impairment caused by post-traumatic stress disorder was merely temporary); *Sanders v. Arneson Prods., Inc.,* 91 F.3d 1351, 1354 (9th Cir.1996) (temporary psychological impairment lasting less than four months was of insufficient duration to constitute "disability" under ADA). Accordingly, we hold that plaintiff has failed to show that her mental impairment substantially limits her major life activity of working.

## B. *"Qualified Individual" Within the Meaning of the ADA*

Even assuming *arguendo* that Mescall was disabled, she has failed to establish that she was otherwise "qualified" for the position of guidance counselor at P.S. 21. The ADA defines a "qualified individual" as one who has a disability but "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

■ Plaintiff has testified that the essential functions of an elementary school guidance counselor in the District include: counseling children individually, in small groups, large groups or classrooms; crisis intervention; paperwork; working with supervisors; implementing District policy; and maintaining regular attendance. Mescall claims that she was qualified because she performed all necessary counseling duties that were not in violation of her contract and received satisfactory performance evaluations. However, "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis." *Tyndall v. Nat'l Educ. Ctrs. Inc.,* 31 F.3d 209, 213 (4th Cir.1994).

■ Plaintiff admits that she cannot perform the essential functions of her job unless she is present in the school building, yet she missed forty-one days of school during her probationary period prior to February 1997.[18] Moreover, no reasonable accommodation could have improved Mescall's attendance record because none of these absences was the result of her alleged mental disability.[19] To the extent that she requests the accommodation of ignoring medically documented sick days when calculating her attendance record, this accommodation is unreasonable as a matter of law because it "would eliminate an essential function of the job." *Aquinas v. Federal Express Corp.,* 940 F.Supp. 73, 78–9 (S.D.N.Y. 1996).

Therefore, "regardless of the fact that she possessed the necessary [counseling] skills," Mescall "cannot be considered a 'qualified' individual protected by the ADA," because she failed to meet the attendance requirements of her position. *Tyndall,* 31 F.3d at 213; *see also Aquinas,* 940 F.Supp. at 78–9; *Carr v. Reno,* 23 F.3d 525, 529 (D.C.Cir.1994) ("coming to work regularly" is "essential function"); *Jackson v. Veterans Admin.,* 22 F.3d 277, 279–80 (11th Cir.1994) (employee with history of sporadic unpredictable absences was not otherwise qualified); *Law v. Unit-*

18. Contrary to plaintiff's assertions, the District is not basing its attendance argument on absences caused by Mescall's mental impairment which she concedes did not become disabling until February 1997. Even if it were, "[t]he ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." *Allen v. GTE Mobile Comm. Service Corp.,* No. 1:95–cv–463–MHS, 1997 WL 148670, at *3 (N.D.Ga. Feb.26, 1997).

19. The only accommodation formally requested by Mescall was the leave of absence which the District granted. However, there was no indication that Mescall's attendance would improve upon her return to P.S. 21 because the absences prior to February 1997 were caused by non-related illnesses or injuries (*i.e.,* colds, conjunctivitis, back and neck injuries, etc.). If anything, Mescall's attendance would diminish because Delgado, the catalyst for her mental deterioration, has been granted tenure as Principal of P.S. 21. *See id.,* at *2.

*ed States Postal Serv.*, 852 F.2d 1278, 1279–80 (Fed.Cir.1988) (regular and reliable level of attendance is necessary element of most jobs).[20] Accordingly, Mescall has failed to establish the second and third elements of prima facie case of discrimination under the ADA.

### C. *Reason for Termination*

Even if Mescall had established a prima facie case of disability discrimination, the District has set forth two adequate, non-discriminatory reasons for its actions, *i.e.*, absenteeism and insubordination. We need not be persuaded that these were the District's true motives; rather, the District need only produce evidence which, if true, would permit the conclusion that there was a non-discriminatory reason for the adverse tenure recommendation. *See Greenway*, 143 F.3d at 52. Therefore, to defeat the District's motion for summary judgment, Mescall must produce sufficient evidence to support a rational finding that the reasons proffered by the District were false, and that more likely than not, her disability was the real reason for her denial of tenure. *See Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994) (citing *St. Mary's*, 509 U.S. at 515, 113 S.Ct. 2742).

■ In her opposition to the District's motion for summary judgment and deposition testimony, Mescall does not challenge the District's proof with respect to her attendance record and refusal to follow directives; instead, she provides explanations for her behavior. Mescall has offered no evidence suggesting that the District treated her differently than other employees; that the District departed from its normal policies in denying her tenure; or that non-disabled probationary teachers or guidance counselors who acted similarly to Mescall were retained. *See*

*Meiri v. Dacon*, 759 F.2d 989, 997–98 (2d Cir.1985). Aside from the blanket allegations contained in the complaint, Mescall offers no arguments or proof to suggest that she was terminated because of her alleged mental disability. Indeed, the tenure review process commenced before she requested a medical leave of absence based on her alleged disability.

Even if the explanations offered by the District were false, it would not necessarily follow that the true reason Mescall was denied tenure was disability discrimination. "The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case." *Fisher*, 114 F.3d at 1338 (citing *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559 (7th Cir.1987) which noted that "the employer [may be] trying to hide some other offense"). Here, at best, plaintiff has raised a genuine issue of fact as to whether Mescall's union activity was the real reason for her discharge. She does not allege that Delgado campaigned against her receiving tenure because of her alleged mental disability, but because of her union involvement. "[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent." *Fisher*, 114 F.3d at 1338. Under these circumstances, it is apparent that Mescall's purported disability was neither the sole cause nor even a motivating factor in her denial of tenure. Viewing all of the evidence in the light most favorable to plaintiff, we are convinced that no rational jury could find that the District's decision to deny tenure to Mescall was motivated by disability discrimination.

Plaintiff has presented no evidence which could lead a reasonable fact finder

---

**20.** Mescall has also admitted that, on several occasions, she refused to follow the directives given by Delgado because she believed that they were in violation of her contract. *See, e.g.*, Mescall Dep. at 441–44. Mescall's refusal to follow the directives of her supervisors may constitute a separate ground for finding that she is not otherwise qualified but, because of the Court's holding with respect to her absenteeism, we need not reach that issue.

to conclude that she is a "qualified individual with a disability" as those terms are defined by the ADA, or that her employment was terminated because of her alleged disability. It is therefore clear that Mescall cannot establish a cognizable claim of discrimination under the ADA. Accordingly, the District's motion for summary judgment dismissing plaintiff's claim for discrimination in violation of the ADA is granted.

### D. Plaintiff's Retaliation Claim

■ The ADA prohibits retaliation against an employee who has engaged in statutorily protected activity:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). To state a claim for discriminatory retaliation, a plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See Querry v. Messar,* 14 F.Supp.2d 437, 450 (S.D.N.Y.1998) (ADA) (citing *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998) (Title VII)).

■ Mescall asserts that the District retaliated against her for "for opposing [disability] discrimination in the workplace." The only acts committed by Mescall which would fall under the category of protected activities are: (1) the submission of a letter dated April 3, 1997 requesting that the Board of Education reconsider her request for a leave of absence; and (2) the filing a charge of disability discrimination with the EEOC on June 19, 1997. However, the undisputed evidence in the record shows that the tenure review process had begun in February or early March of 1997, Delgado's adverse recom-

mendation was written on March 13, 1997, and on March 15, 1997, Citarella had advised Mescall that she would be denied tenure as a result of her absenteeism. Therefore, Mescall has failed to establish a causal connection between the protected activity and the adverse employment action. Accordingly, the District is entitled to summary judgment dismissing plaintiff's claim of retaliation in violation of the ADA.

### III. Plaintiff's § 1983 Claim

Mescall's § 1983 claim alleges that Marra and the District deprived her of her rights guaranteed by the First Amendment, namely the "right to associate for the purpose of engaging in those activities protected by the First Amendment— speech, assembly, [and] petition for the redress of grievances." *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

■ Defendants concede that Mescall was engaged in conduct protected by the First Amendment, *i.e.,* becoming active in the Union and attempting to bring the Union into P.S. 21. However, in order to establish a prima facie case for retaliation, Mescall must show that her association with the Union was a substantial or motivating factor in the defendants' decision to deny her tenure. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Piesco v. Koch,* 12 F.3d 332, 342 (2d Cir.1993); *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993). Mescall has provided sufficient evidence in support of this element to withstand a motion for summary judgment—most notably, her own deposition testimony regarding Delgado's overt statements that she would ensure the denial of Mescall's tenure because of her union activities, threats which were followed and allegedly carried out by Delgado's submission of an adverse recommendation, and evidence that defendants relied on Delgado's criticisms in deciding to deny tenure

to Mescall despite having knowledge of Delgado's alleged anti-union vendetta against Mescall.[21] Summary judgment on this issue must also be denied because defendants' motivation presents a question of fact for the jury. *See Piesco*, 12 F.3d at 342; *Frank*, 1 F.3d at 1329.

Defendants may nonetheless escape liability if they can show, by a preponderance of the evidence, that they would have refused to grant tenure to Mescall in the absence of her association with the Union. *See Mt. Healthy*, 429 U.S. at 286, 97 S.Ct. 568; *Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 274 (2d Cir.1996); *Frank*, 1 F.3d at 1329. Notwithstanding defendants' strenuous assertion that Mescall's absences and insubordination, standing alone, would dictate the termination of her employment with the District, the resolution of this issue depends heavily on the credibility of witnesses and therefore presents an issue of fact which cannot be resolved on a motion for summary judgment. *See Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir.1984) (Mt. Healthy defense requires fact-finding, except in rare cases where the undisputed facts demonstrate that the challenged action would have been taken on the valid basis alone); *Schallop v. New York State Dept. of Law*, 20 F.Supp.2d 384, 394–95 (N.D.N.Y.1998).

Without Delgado's adverse tenure recommendation in Mescall's personnel file, Marra and the District would see only satisfactory performance recommendations,[22] the District's attendance record showing Mescall's absences and the documentation provided with respect to such absences. Considering that the District did not have a written policy establishing a specific number of absences which would require the denial of tenure, summary judgment is not appropriate in this case.

### A. *Official Policy, Custom or Practice*

The District further argues that it is entitled to summary judgment because plaintiff has failed to establish that the alleged constitutional violation resulted from an official policy, custom or practice of the District, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), because she did not present evidence that the municipal action was taken with "deliberate indifference" to its obvious or known unconstitutional, consequences. *See Bd. of County Comm'rs. v. Brown*, 520 U.S. 397, 406–07, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

■ In order to satisfy this requirement, Mescall need not prove that the District had a formal rule or regulation that caused the constitutional deprivation, *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995); *Villante v. Dep't of Corrections*, 786 F.2d 516, 519 (2d Cir. 1986), rather, she need only produce evidence that the District was aware of a pattern of unconstitutional conduct by its employee but failed to take any action. *See Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir.1992).

■ Mescall has produced sufficient evidence of "deliberate indifference" to defeat the District's motion for summary judgment. The record is replete with proof of Delgado's animosity toward the Union and fear of retaliation among the faculty at P.S. 21. There is also sufficient evidence that the District was made aware of these circumstances through the Union representatives, Citarella, Hardeman and Marra, yet failed to remove Delgado from her position as Principal of P.S. 21. There is also a genuine issue of fact as to wheth-

---

21.  *See* Part III(B) *infra*.

22.  The alleged incidents of insubordination, delay in processing referrals and disorganized classroom presentation may never have been brought to the District's attention. Although, Ms. London's 1995/96 written review did mention Mescall's absences. Mescall claims that this was in retaliation for her involvement with the Union, but it was Ms. London who advised Mescall to contact the Union for advise.

er or not the District was specifically aware of Delgado's alleged personal vendetta against Mescall. We therefore conclude that a rational jury could find that the District acted with "deliberate indifference" to the consequence of its actions.

### B. *Marra's Affirmative Defense of Qualified Immunity*

■ Marra claims that he is entitled to qualified immunity and, therefore, plaintiff's § 1983 claim against him in his individual capacity must be dismissed. Government officials are generally immune from liability for civil damages in connection with the performance of their discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Bruneau ex rel. Schofield v. South Kortright Cent. Sch. Dist.,* 163 F.3d 749, 755 (2d Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 2020, 143 L.Ed.2d 1032 (1999).

■ The present record in this action does not permit summary judgment in favor of Marra on his qualified immunity defense. Marra argues that there is no evidence in the record to support a finding that, at the time he recommended that Mescall not receive tenure, he was aware that Mescall had ever exercised her First Amendment rights or that Delgado had threatened her with a denial of tenure for her exercise of such rights. However, Mescall's letter to Marra dated May 28, 1997, which predates Marra's recommendation to the Board, challenged every issue raised by Delgado in her adverse recommendation and explicitly stated, "Mrs. Delgado threatened me with not recommending me for tenure when I requested union representation." We therefore conclude that genuine issues of material fact exist with respect to, *inter alia,* whether Marra knew or should have known that the denial of tenure to Mescall would violate her constitutional rights. *See Frank,* 1 F.3d at

1329. Accordingly, Marra's motion for summary judgment on the ground of qualified immunity is denied with leave to renew at trial.

### CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is granted insofar as it seeks dismissal of plaintiff's ADA claims, and denied insofar as it seeks dismissal of plaintiff's § 1983 claims based on alleged violations of plaintiff's rights under the First Amendment as set forth in the Order issued on May 26, 1999.

SO ORDERED.